TIMOTHY WILSON SPENCER

V.

COMMONWEALTH OF VIRGINIA

Record No. 890579

TIMOTHY WILSON SPENCER

V.

COMMONWEALTH OF VIRGINIA

Record No. 890580

November 10, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas,* Whiting, and Lacy, JJ.

* Justice Thomas participated in the hearing and decision of this case prior to the effective date of his resignation, November 1, 1989.

*Jeffrey L. Everhart (David J. Johnson; Tuck & Everhart*, on brief), for appellant. (Record Nos. 890579 and 890580)
*Donald R. Curry, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Richard A. Conway*, Assistant Attorney General, on brief), for appellee. (Record Nos. 890579 and 890580)

Justice Stephenson delivered the opinion of the Court.

In a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, Timothy Wilson Spencer was convicted of the capital murder of Dr. Susan Hellams, *i.e.*, the willful, deliberate, and premeditated murder during the commission of, or subsequent to, rape, former Code § 18.2-31(e) (1987 Cum. Supp.). The jury also convicted Spencer of the rape of Hellams, of the forcible sodomy of Hellams, and of burglary, *i.e.*, breaking and entering Hellams' dwelling house in the nighttime with intent to commit rape.

The jury fixed Spencer's punishment at death for the capital murder conviction, at life imprisonment for both the rape and the sodomy convictions, and at 20 years' imprisonment for the burglary conviction. Following a sentencing hearing, the trial court imposed the penalties fixed by the jury and entered final judgments on the jury verdicts.

We consolidated Spencer's appeal of the capital murder conviction with the automatic review of his death sentence, Code §§ 17-110.1(A) and -110.1(F), and gave them priority on our docket, Code § 17-110.2 (Record No. 890579). On May 17, 1989, we or-

dered that Spencer's appeals of the rape, sodomy, and burglary convictions be certified from the Court of Appeals for our review (Record No. 890580). We consolidated these appeals with the appeal and review of the capital murder conviction and death sentence.

## I

Pursuant to well-established principles of appellate review, we must view the evidence and all inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial. Dr. Hellams, a resident in neurosurgery at the Medical College of Virginia, was last seen alive about 10:50 p.m., on October 2, 1987. At that time, she was in the area of 9th and Capitol Streets in the City of Richmond and was preparing to return to her Southside Richmond home located at 514 West 31st Street.

On October 2, 1987, Spencer resided at 1500 Porter Street in the City, a distance of approximately 1.8 miles from Hellams' residence. The record shows it takes approximately 17 minutes to walk that distance. Spencer left his residence at 7:45 p.m., on October 2, and did not return until 1:45 a.m., on October 3.

Dr. Hellams' husband, Marcel Sleg, returned to the couple's home about 1:30 to 1:40 a.m., on October 3. After taking a shower, Sleg observed that his wife was not in their bed, and shortly thereafter he discovered her dead body on the floor of the bedroom closet. The police received Sleg's telephone call for assistance at 1:56 a.m.

Hellams' body was nude above the waist. Her skirt and slip had been pulled up, and her underpants had been removed. She was wearing red socks and a red shoe on her left foot.

Two ligatures were around Hellams' neck, one made from a red belt and the other from a blue cloth belt. Hellams' wrists were tied tightly together behind her back with an electrical extension cord and another blue belt. Another belt was around the lower portion of Hellams' left leg.

A six-foot high security fence enclosed the rear yard of the victim's residence. A second-story porch was immediately outside Hellams' bedroom window. A large portion of the screen from the bedroom window had been cut and removed and was found by the police on the floor of the porch. The screen and window were intact when Sleg last left the house.

The medical examiner testified that "ligature strangulation" caused Hellams' death. The medical examiner also testified that the victim had sustained a fractured nose, a blunt force injury to the lower lip that had caused bleeding and swelling, and various other contusions and abrasions. "[C]urva-linear marks" with "black material embedded in the abrasion" were found on the back of the victim's right leg. The medical examiner opined that such marks are typical of those made by the edge of a shoe.

The medical examiner also found body fluids on the victim's back and in the gluteal fold, right beneath the buttocks. This fluid had the strong musky odor of seminal fluid. The victim had sustained small mucosal tears of the anal ring. The medical examiner testified that these injuries are consistent with the anus having been penetrated "by a hard object, such as a penis."

The Commonwealth's expert serologist identified spermatozoa on the swabs taken from the victim's vagina, rectum, and perianal region. The serologist also identified seminal fluid and spermatozoa on Hellams' skirt and slip.

A sample of Spencer's blood was analyzed by the serologist. The analysis revealed that Spencer is a type O secretor, PGM type 1, PGM subtype 1+, and peptidase A type 1. Only 13 percent of the population, including men, women, and children, have this particular combination of blood types.

Hellams was a non-secretor, PGM type 2-1, PGM subtype 2+1-, and peptidase A type 1. Hellams' husband is a non-secretor, PGM type 2-1, and PGM subtype 2+1+.

The serologist identified type O secretions on the swabs taken by the medical examiner from the victim's perianal area. The serologist also identified type O secretions in the seminal fluid found on the victim's skirt and slip. The serologist testified that the identified secretions must have originated from a third party because both Hellams and Sleg were non-secretors. The expert further stated that the secretions in the seminal fluid found on the victim's skirt and slip were consistent with Spencer's type and inconsistent with Sleg's type. Additionally, the secretions in the seminal fluid found on the perianal swabs were consistent with a combination of the blood types of Spencer and the victim and inconsistent with a combination of the blood types of the victim and her husband.

Spencer's blood sample and a sample of the seminal fluid found on the victim's slip were subjected to a "DNA Printing" proce-

dure.[1] The DNA printing procedure established that the DNA molecules extracted from Spencer's known blood sample matched the DNA molecules extracted from the seminal fluid found on the victim's slip.[2]

The defense presented no evidence in the guilt phase of the trial.

## II

As in *Spencer v. Commonwealth*, 238 Va. 275, 281, 384 S.E.2d 775, 777 (1989) (*Spencer I*), and in *Spencer v. Commonwealth*, 238 Va. 295, 302, 384 S.E.2d 785, 790 (1989) (*Spencer II*) (which were decided the same day), Spencer again challenges the constitutionality of the death penalty statutes, "both on their face and as applied." He first contends that "[t]he death penalty is, in all circumstances, cruel and unusual punishment prohibited by the eighth and fourteenth Amendments to the United States Constitution." We considered and rejected this contention in *Spencer I* and in *Spencer II*. In doing so, we adhered to our repeated holding that the death penalty does not constitute cruel and unusual punishment. *See, e.g., Hoke v. Commonwealth*, 237 Va. 303, 306, 377 S.E.2d 595, 597, *cert. denied*, 491 U.S. \_\_\_ (1989); *Pope v. Commonwealth*, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987), *cert. denied*, 485 U.S. 1015 (1988); *Gray v. Commonwealth*, 233 Va. 313, 320, 356 S.E.2d 157, 160-61, *cert. denied*, 484 U.S. 873 (1987); *Beaver v. Commonwealth*, 232 Va. 521, 527, 352 S.E.2d 342, 345-46, *cert. denied*, 483 U.S. 1033 (1987); *Stockton v. Commonwealth*, 227 Va. 124, 134-35, 314 S.E.2d 371, 378, *cert. denied*, 469 U.S. 873 (1984); *Whitley v. Commonwealth*, 223 Va. 66, 77-78, 286 S.E.2d 162, 168-69, *cert. denied*, 459 U.S. 882 (1982); *Bassett v. Commonwealth*, 222 Va. 844, 851, 284 S.E.2d 844, 849 (1981), *cert. denied*, 456 U.S. 938 (1982); *Martin v. Commonwealth*, 221 Va. 436, 439-40, 271 S.E.2d 123, 125-26 (1980); *Clark v. Commonwealth*, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), *cert. denied*, 444 U.S. 1049 (1980); and *Smith v. Commonwealth*, 219 Va. 455, 476, 248

[1] "DNA" is the abbreviation for deoxyribonucleic acid, the chemical that carries an individual's genetic information. No two individuals, except identical twins, have the same DNA pattern, and the parties stipulated that Spencer does not have an identical twin.

[2] Spencer is a black male. Based upon statistical data, the chance that Spencer's DNA pattern would be found at random "in the North American black population would be 1 in 705 million." There are approximately ten million adult black males in North America.

S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979). Accordingly, we reject Spencer's contention that the death penalty constitutes cruel and unusual punishment.

▪ Spencer also contends that the death penalty statutes are unconstitutional because the sentencing procedure provided for in the statutes "gives improper and excessive authority to the jury." We previously rejected this claim in *Smith*, 219 Va. at 476-78, 248 S.E.2d at 148-49, and we reaffirm that holding.

▪ We also reject Spencer's contention that the statutory aggravating factors are unconstitutionally vague. *See, e.g., Spencer II*, 238 Va. at 302, 384 S.E.2d at 790; *Hoke*, 237 Va. at 305, 377 S.E.2d at 597; *Gray*, 233 Va. at 320-21, 356 S.E.2d at 161 (compiling cases).[3]

## III

▪ In a pretrial hearing on the admissibility of the DNA print identification evidence, Dr. Richard J. Roberts, Assistant Director of the Cold Spring Harbor Laboratory in New York, testified as an expert for the Commonwealth. While qualifying Dr. Roberts as an expert, the Commonwealth, over Spencer's objection, was permitted to show that the director of the laboratory had won the Nobel Prize. On appeal, Spencer contends that this testimony was irrelevant and prejudicial, and, therefore, the trial court "violated [his] rights to due process, equal protection and a fair trial as guaranteed by the 5th, 6th and 14th Amendments to the United States Constitution."

Spencer contended the same in *Spencer II*, and we concluded that the contention was meritless. Again, assuming, without deciding, that the testimony was inadmissible, we reject the contention for the reasons previously stated in *Spencer II*:

[A] trial court, as opposed to a jury, is presumed to separate "the admissible from the inadmissible," and to have considered only competent evidence. *Richard Eckhart* v. *Common-*

---

[3] On appeal, Spencer contends that the death penalty statute is "vague" because it "does not specify which party bears the burden of proof on the question of mitigation, and does not specify the standard of proof for carrying that burden." This contention was not presented to the trial court. Thus, we will not consider it on appeal. Rule 5:25. Similarly, to the extent that Spencer undertakes to raise an "equal protection" claim on appeal, such claim, not having been raised at trial, also is defaulted.

*wealth*, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981). Moreover, Dr. Roberts' qualifications were substantial and unchallenged by Spencer. Indeed, whether Dr. Roberts qualified as an expert was a matter within the trial court's sound discretion, *Lane v. Commonwealth*, 223 Va. 713, 718, 292 S.E.2d 358, 361 (1982), and we find no abuse of that discretion.

238 Va. at 305, 384 S.E.2d at 792.

■ At the same pretrial hearing, Dr. Roberts testified unequivocally that there was no disagreement in the scientific community about the reliability of DNA print testing. Spencer contends that the trial court erred in limiting his cross-examination of Dr. Roberts on this point. Spencer, however, made no proffer of the questions he wanted to ask Dr. Roberts and of the answers Dr. Roberts would have given. Spencer's failure to make such a proffer precludes appellate review of this claim. *Spencer II*, 238 Va. at 305, 384 S.E.2d at 792; *Mackall v. Commonwealth*, 236 Va. 240, 256-57, 372 S.E.2d 759, 769 (1988), *cert. denied*, 492 U.S. ____ (1989).

## IV

The trial court excluded venireman Maureen Owens from the jury upon a finding that Owens "wouldn't impose [the death penalty] under any circumstances." Spencer contends that the court erred in excluding Owens.

During jury *voir dire*, the following exchange occurred between the trial judge and Owens:

[TRIAL JUDGE]: Do you have any religious or conscientious scruples against the imposition of the death penalty in the proper case?

OWENS: Yes, I do.

[TRIAL JUDGE]: Are you saying no matter what would happen, you would not impose the death penalty?

OWENS: Yes, sir.

[TRIAL JUDGE]: Under no circumstances, would you impose the death penalty?

OWENS: No, sir, I couldn't.

When Spencer's counsel attempted to rehabilitate Owens, the following exchange occurred:

OWENS: I wouldn't want to put myself in that position if it could be avoided. My religious convictions are such that I don't believe in the death penalty, regardless of what the individual has done.

[DEFENSE COUNSEL]: You could not follow the law as the Judge instructed you?

OWENS: I mean, I couldn't break the law, if that is the law. Obviously, I would have to go along with it. All I am saying is, I wouldn't want to put myself in that position, if it could be avoided.

[DEFENSE COUNSEL]: Assume then, if you will, with me, that a duty that you might have as a citizen of the Commonwealth would be to put yourself in that position. I am asking, in light of, or in spite of your religious or moral convictions against the death penalty, could you at least open your ears, your mind to your fellow jurors, to the evidence of the Commonwealth, to the evidence of the defense, and to the law of the Commonwealth of Virginia as Judge Wilkinson will instruct you? Could you consider imposing the death penalty?

OWENS: If I had to do that, yes, sir, I would. If I was, if I had to follow the dictates of the law, then, yes, I would.

The *voir dire* of Owens concluded with the following exchange between Owens and the prosecutor:

OWENS: I find it to be a very difficult position. Because I want to do what is right as a citizen, to be a juror. However, I do not believe in the death penalty. I would consider it. But as far as making a determination, I would have to say no.

[PROSECUTOR]: That you could not impose it?

OWENS: I couldn't impose it. And I thought I had made myself clear when I said that. Maybe I haven't.

[PROSECUTOR]: Would there be any arguments advanced that would enable you to impose it? Either gruesomeness of the offense or anything like that, or is it just your belief that you cannot impose the death penalty?

OWENS: I personally don't believe that we have the right to take someone else's life, no matter what the individual has done.

■ A trial court in a capital case may properly exclude a juror whose views about the imposition of a death sentence " 'would prevent or substantially impair the performance of his duties . . . in accordance with his instructions and his oath.' " *O'Dell* v. *Commonwealth*, 234 Va. 672, 695, 364 S.E.2d 491, 504 (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)), *cert. denied,* ____ U.S. ____, 109 S.Ct. 186 (1988). *Accord Wainwright* v. *Witt*, 469 U.S. 412, 424 (1985).

■ In *Spencer II*, we stated the appropriate standard of appellate review:

Because a trial judge "sees and hears the juror," *Wainwright*, 469 U.S. at 426, an appellate court must accord the trial judge deference in applying the *Adams-O'Dell* standard, *LeVasseur* v. *Commonwealth*, 225 Va. 564, 584-85, 304 S.E.2d 644, 654-55 (1983), *cert. denied*, 464 U.S. 1063 (1984). Absent a showing of "manifest error," we will not disturb the trial judge's decision on appeal. *Bennett* v. *Commonwealth*, 236 Va. 448, 469, 374 S.E.2d 303, 316 (1988), *cert. denied*, 490 U.S. ____ (1989).

238 Va. at 307, 384 S.E.2d at 793.

■ In the present case, Owens repeatedly and unequivocally stated that she could not impose the death penalty under any circumstances. We, therefore, cannot say that the trial court abused its discretion. Indeed, the court's finding is clearly supported by the record.

## V

In the present case, the undisputed evidence established that the DNA print identification test[4] was properly conducted. Spencer contends, however, that the trial court erred in admitting into evidence the results of the DNA print identification test "because the Commonwealth failed to establish its reliability and its general acceptance in the scientific community." Spencer contended the same in *Spencer I* and in *Spencer II*. In those cases, in which the issue was one of first impression, we held that DNA testing is a reliable scientific technique.[5] 238 Va. at 290, 384 S.E.2d at 783; 238 Va. at 315, 384 S.E.2d at 797. We adhere to those holdings. Thus, the trial court did not err in admitting the DNA print evidence.

## VI

Spencer also contends that the trial court erred in qualifying Dr. Kevin C. McElfresh as an expert in the fields of molecular and population genetics. Spencer claims that "[t]he Commonwealth failed to establish [McElfresh's] qualifications as an expert and his testimony violated [Spencer's] rights to due process, equal protection and a fair trial as guaranteed by the 5th, 6th and 14th Amendments to the United States Constitution." We do not agree.

Whether to qualify a witness as an expert rests largely within a trial court's discretion. *Spencer II*, 238 Va. at 313, 384 S.E.2d at 796; *Freeman v. Commonwealth*, 223 Va. 301, 315, 288 S.E.2d 461, 469 (1982). The court's decision will not be dis-

---

[4] The DNA print identification test consists of a series of chemical procedures that break down the DNA molecule into fragments of various lengths. The DNA fragments are arranged along parallel lines according to the length of the fragments. The resulting pattern of fragments is unique to each individual. In a rape investigation, the pattern of fragments of the semen samples collected from the crime scene is then compared with the pattern of fragments obtained from the alleged assailant's blood sample. If the semen and blood samples are from the same person, the fragment patterns will be identical.

For a detailed explanation of the DNA print identification technique , see *Spencer I*, 238 Va. at 286-89, 384 S.E.2d at 781-82, and *Spencer II*, 238 Va. at 313-14, 384 S.E.2d at 797.

[5] Spencer urges upon us the so-called "*Frye* test." To meet the *Frye* test, a trial court must be convinced not only that the evidence is reliable but that it is generally accepted by the scientific community. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). We have rejected the adoption of the *Frye* test. *Spencer I*, 238 Va. at 290 n.10, 384 S.E.2d at 783 n.10; *O'Dell*, 234 Va. at 695-96, 364 S.E.2d at 504. However, even if the *Frye* test applied, DNA printing would satisfy the test.

turbed on appeal unless the record clearly shows that the witness was not qualified. *Id.*

Dr. McElfresh is the manager and supervisor of the forensic and paternity laboratories at Lifecodes Corporation. He has extensive education and experience in the specialized fields of molecular and population genetics.[6] He has written numerous articles in his speciality fields. In addition to his supervisory duties at the laboratories, Dr. McElfresh has used the DNA printing technique over a hundred times at Lifecodes and approximately a thousand times at other places. Prior to the present trial, Dr. McElfresh has served as an expert 17 times in 11 different states.

After both counsel and the trial court examined Dr. McElfresh about his expertise regarding the DNA printing technique, the court concluded that the witness was eminently qualified to render opinions in the fields of molecular and population genetics. The record supports that conclusion, and we hold that the trial court did not abuse its discretion.

## VII

Spencer further contends that the evidence is insufficient to support his convictions of rape and capital murder. This is so, he asserts, because the evidence failed to prove beyond a reasonable

---

[6] Dr. McElfresh summarized his education and experience as follows:

I received a bachelor of science in biology with a minor in chemistry and pathology from Florida International University, in Miami, Florida; followed that with a masters degree in molecular, cellular, and developmental biology in Iowa University, with a specialty in genetics; followed that by my molecular and population genetics from the University of Georgia in Athens. Subsequent to that time — which that was February of 1984 — I received my doctorate. Since then, I have done post-doctoral work for the bio-technology, bio-resources program at the University of Georgia for which I had a grant. After that, I did a second short post-doctoral study in the Department of Plant Pathology at the University of Florida. Then I took a position with the United States Department of Agricultural Research Service Experimentation in Gainesville, Florida. And then I went to work for LIFECODES.

During that period of time, I did extensive study on the general structure and function of a number of organisms and how those genes, as a result of their structure and function, might be found in a variety of populations. That is correlating how a gene was built and how that gene functioned, and then how that allowed an organism to function within a population of organisms in the environment.

. . . .

I am also . . . an adjunct professor of microbiology in Valhalla, New York, [where I] teach a course in human molecular genetics . . . .

doubt that his penis penetrated the victim's vagina. This contention is meritless.

As previously noted, when the victim was found she was nude above the waist. Her skirt and slip had been pulled up, and her underpants had been removed. She had been bound, beaten, and strangled to death. Sperm was found in her vagina and in her rectum. Seminal stains found on the victim's skirt and slip were positively linked to Spencer by the DNA print test.

■ We conclude that the evidence and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth, fully support the jury's finding of penetration. Therefore, we affirm the convictions of rape and capital murder. *See, e.g., Spencer I*, 238 Va. at 292, 384 S.E.2d at 784; *Spencer II*, 238 Va. at 315-16, 384 S.E.2d at 798; *Tuggle v. Commonwealth*, 228 Va. 493, 509-12, 323 S.E.2d 539, 549-50 (1984), *vacated and remanded on other grounds*, 471 U.S. 1096 (1985), *aff'd on remand*, 230 Va. 99, 334 S.E.2d 838 (1985), *cert. denied*, 478 U.S. 1010 (1986).

## VIII

### A

■ Spencer contends that the facts and circumstances of the present case do not warrant imposition of the death penalty. Before imposing a death sentence, a jury must find from the evidence beyond a reasonable doubt that there is a probability, based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused, that he would commit criminal acts of violence that would constitute a "continuing serious threat to society," or that the defendant's conduct in committing the offense was "outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Code § 19.2-264.4(C). After the presentation of evidence in the penalty phase of the trial, the jury fixed Spencer's sentence at death based upon findings that both the "future dangerousness" and "vileness" predicates had been proved beyond a reasonable doubt.

The evidence reveals that in September 1987, Spencer was released from prison to a "half-way" house located in the City of Richmond. While at the "half-way" house, Spencer remained in

the custody of the Department of Corrections. Within 30 days of his release from prison, Spencer raped and murdered two women in the City of Richmond, Debbie Dudley Davis and Hellams. In late November 1987, he raped and murdered Susan Tucker in Arlington County. The facts and circumstances of the three rape-murders were remarkably similar. All three of Spencer's victims died from ligature strangulation.

Spencer had six prior burglary convictions, three as a juvenile and three as an adult. He also had been convicted of three charges of trespassing.

Spencer's conduct in committing the offenses against Hellams was especially egregious. He not only raped and sodomized Hellams, but he beat, bound, and strangled her. Such a method of killing involved both physical and psychological "torture" of the victim, and evinced "depravity of mind," *i.e.*, "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." *See Smith*, 219 Va. at 478, 248 S.E.2d at 149. Also, Spencer's conduct unquestionably involved "aggravated battery" to the victim because his battery of her was "qualitatively and quantitatively . . . more culpable than the minimum necessary to accomplish an act of murder." *Id.*

Spencer presented three witnesses who gave evidence in mitigation of punishment. A community center employee and lifetime friend of Spencer's described him as a "normal young person" who caused no problems at the community center and who always was mannerly and respectful to others. Spencer's mother and grandmother also testified. His grandmother, who raised Spencer until age nine, stated that Spencer was never a problem to her.

 Having considered all aggravating and mitigating factors, we hold that the evidence clearly supports the jury's findings of both the "future dangerousness" and the "vileness" predicates.

## B

Code § 17-110.1(C) mandates that we review the death sentence on the record to consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or dispropor-tionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have accumulated the records of all capital murder cases reviewed by this Court, Code § 17-110.1(E), and after consider-ing those records, we conclude that Spencer's sentence of death was not excessive or disproportionate to sentences generally im-posed by other sentencing bodies in Virginia for comparable or similar crimes. *See, e.g., Spencer I,* 238 Va. at 292-93, 384 S.E.2d at 784-85 (compiling cases). Additionally, nothing in the record suggests that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

## IX

We have considered all assignments of error that Spencer ar-gued on brief[7] and find no reversible error. We also have reviewed the sentence of death as mandated by Code § 17-110.1 and hold that the sentence should be affirmed. Accordingly, the trial court's judgments will be affirmed.

*Record No. 890579—Affirmed.*
*Record No. 890580—Affirmed.*

---

[7] Spencer did not argue on brief assignments of error numbered 8, 9, 15, 17, and 18. Consequently, those contentions have been waived. *O'Dell,* 234 Va. at 679, 364 S.E.2d at 495.