COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Decker and Russell
Argued at Arlington, Virginia

**PUBLISHED**

PATRICK JOSEPH WAKEMAN

OPINION BY
v.        Record No. 1631-17-4        JUDGE WESLEY G. RUSSELL, JR.
NOVEMBER 27, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
Dennis L. Hupp, Judge

J. Lloyd Snook, III (Snook & Haughey, P.C., on brief), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Patrick Joseph Wakeman was convicted by a jury of rape by force or threat in violation of

Code § 18.2-61.[1]  On appeal, he claims the trial court erred in qualifying Nurse Raymer Balciunas

as an expert in the area of sexual assault forensic examination when she did not possess a formal

certification as a Sexual Assault Nurse Examiner (SANE).  For the reasons that follow, we affirm

the judgment of the trial court.

BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at

trial in the light most favorable to the Commonwealth, the prevailing party below."  Bolden v.

Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008).  So viewed, the evidence

establishes that Wakeman's wife asked the victim, L.N., if she would babysit the couple's two

small children on April 23, 2016.  L.N. agreed to do so.

---

[1] Wakeman was charged with two counts of rape.  The jury acquitted him of one of the
two charges.

Although L.N. was sixteen years old at the time, she did not have a driver's license, so Wakeman picked her up at about 8:30 that morning and brought L.N. to his house. After finishing breakfast with L.N. and his two children, Wakeman asked L.N. to accompany him outside while he smoked. While outside, Wakeman commented on L.N.'s physical appearance and took a photograph of her with L.N.'s phone's camera. L.N. testified at trial that they then went back into the house and that Wakeman "wanted to teach me some moves in case I was ever in a bad situation that I needed to get out of." Wakeman then went upstairs and put an obstacle in front of one of the doors so that a child could not come downstairs undetected.

He then began instructing L.N. regarding self-defense techniques. For the first technique, he instructed L.N. to get on her hands and knees and then roll over and put her legs around his neck. L.N. complied. After that, he taught her a second move, which was similar to the first except that L.N.'s head rested on the ground and her hands were behind her back. Wakeman instructed L.N. to roll over and put a leg around his neck. While she was practicing this move for the second or third time, Wakeman put his hand underneath L.N.'s shirt but over her bra and made a comment about her breasts.

Around that time, L.N. received a facetime message from a friend, so she called her back and texted another friend that Wakeman had just sexually assaulted her. Wakeman went outside to smoke, and, when he returned, said he wanted to teach L.N. a third move. This technique required L.N. to lie on her back with her legs over one of his shoulders. She was supposed to kick him in the chest, but instead, Wakeman pulled up her tank top and bra, exposing her breasts. He then pulled her pants down to her knees while holding her hands down behind her head. He removed his pants, spit on his hand, and rubbed his penis. He kept telling L.N. that this is what a rapist would do to her. He then placed the tip of his penis into her vagina as he continued to tell her that "the rapist is going to do this." The encounter ended when Wakeman's daughters came downstairs.

Wakeman took the girls back upstairs.  While he was upstairs, L.N. again texted her friend.  She asked the friend to come get her because Wakeman had just assaulted her.

When Wakeman came back downstairs, he told L.N. he was going to teach her a fourth maneuver.  He positioned L.N. on her knees in front of the couch with her head positioned on the couch.  Wakeman removed each of their pants and instructed L.N. to roll over and push him off.  He then inserted his penis into her vagina and, according to L.N., "started thrusting as I was trying to roll over, he told me I had to fight harder . . . .  He was using force against me."  L.N. kept trying to roll over as instructed, but was unsuccessful.  L.N. estimated the episode lasted five minutes.  L.N. testified that Wakeman never ejaculated.  When Wakeman noticed L.N. was crying, he pulled his pants up and said "oh shit . . . if you ever tell the cops that this . . . how I taught you, I could go to jail for twenty (20) years."  Wakeman, as he was leaving the house, said, "I'm going to eat a bullet now."  Immediately after the incident, L.N. texted her friend and informed her that Wakeman "just raped me."  Finally, L.N. detailed the events in a text to a third friend because L.N. knew she eventually would be talking to the police.[2]

L.N. went to the Winchester Medical Center and was examined by a forensic nurse, Raymer Balciunas.  Nurse Balciunas testified that she had been employed at Winchester Medical Center since 2010 and had obtained several degrees, including a Bachelor's Degree in History and Sociology, a Master's Degree in Sociology, and a Bachelor's Degree in Science and Nursing.  She

---

[2] Wakeman testified at trial about the events of that morning.  He confirmed that he picked up L.N. and brought her to his home so that she could babysit and that, while she was there, he took photographs of her, albeit at her request.  He claimed that L.N. repeatedly requested that he teach her self-defense techniques and confirmed that he taught her four such techniques that morning.  He denied making the statements she attributed to him, denied he ever removed either her clothing or his, and denied the sexual assaults.  Because the Commonwealth prevailed at trial on the rape charge before us, we are required to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."  Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and internal quotation marks omitted).

had been employed as an emergency room nurse her entire career and indicated that her specialty was in trauma emergency service. She was certified in Emergency Nursing, and, since 2014, had been with the forensic nursing program at the hospital.[3] That program is designed to deal with adults and adolescents who eventually may have contact with law enforcement regarding the treatment they receive at the hospital.

As part of her participation in the program, Balciunas completed significant training, including forty hours regarding adult services and forty hours for adolescent and pediatric services. She completed the training required to be a SANE in 2014, but never obtained the actual certification. Upon questioning by the trial court, Balciunas testified that she had been performing sexual assault examinations on her own since 2014 and had performed them under the supervision of her director in 2013. The Commonwealth offered her as an expert in "sexual assault forensic examination." The trial court stated, "Alright, I'm going to find her to be an expert in that field. I note your exception [defense counsel]."[4]

Although Balciunas was asked some questions that required her to provide expert opinions and explanations, much of her testimony was as a fact witness. Specifically, she testified regarding her examination of L.N. and her collection of specimens from L.N. using the Physical Evidence Recovery Kit (PERK). Included in her description of her collection of samples, Balciunas explained that she used a traction technique to assist in collecting biologic material when performing vaginal swabs and that she did not use a speculum. Balciunas further explained that,

---

[3] Balciunas' trial testimony occurred on May 2, 2017, meaning she had approximately three years of work experience in that role.

[4] Although, at the time of the trial court's qualification decision, Wakeman made no specific objection, it was clear from his counsel's questioning of Balciunas during *voir dire* that he objected to her serving as an expert because she lacked the SANE certification. Given the trial court's statement that Wakeman's exception would be noted, we conclude that Wakeman's argument regarding Balciunas' lack of SANE certification is preserved for our review.

based on a victim's age, history, pain level or discomfort, she sometimes chooses not to use a speculum to retrieve a sample, but instead uses the traction method, which she described as using her forefinger and thumb to open the hymenal tissue to allow collection of DNA with a Q-tip.

Karen Ambrozy, a scientist with the Virginia Department of Forensic Science, qualified at trial as an expert in the field of DNA. She opined that she did not find any foreign body fluids from the sample taken from L.N. However, she determined that the sample taken from L.N. might contain male DNA, and thus, was suitable for a "YSTR" DNA test. She explained that the YSTR test is useful when a scientist is looking for male DNA on a female because only males carry the Y chromosome. Ambrozy then sent the sample to Shai-Mei Smith.

Smith, another forensic scientist with the Virginia Department of Forensic Science, was also qualified by the trial court as an expert in the field of DNA. Smith performed the YSTR test on the sample taken from L.N. and testified that it revealed the presence of male DNA. Based on her analysis, Smith concluded that Wakeman and his patrilineal relatives were potential contributors of the male DNA found in the sample. She testified regarding the likelihood that this Y chromosome profile would be observed in various populations.[5] Finally, she explained that any Y chromosome found in an internal body cavity of L.N. would had to have come from an outside source. Because there was no bodily fluid found on the cervical sample, Smith opined that the foreign DNA likely came from skin cells or saliva. On cross-examination, Smith agreed that the male DNA in this case could be classified as "touch DNA," meaning that it is transferred by contact that can include two people in the same household using the same bathroom or by two people sequentially placing their hands in the same place.

---

[5] She indicated the profile would be expected in one in "1,500 individuals in the Caucasian population[,]" one in "2,000 individuals in the Black population[,]" and one in "1,500 individuals in the Hispanic population."

In his closing argument, Wakeman attacked various aspects of the Commonwealth's case, including alleged inconsistencies in the Commonwealth's evidence. Regarding the DNA sample, he argued that, among other things, it could be explained by it being "touch DNA," which he contended

> was all over the house, male, all over that house. Mr. Wakeman was there. He used the bathroom. She used the bathroom. They all used the bathroom. So it's important that it's possible that some touch DNA . . . could have gotten into that area that would have caused the "Y" chromosomes to be spread past the vagina tissue.

Two counts of rape were submitted to the jury: one based on the contact that occurred during Wakeman's demonstration of the third self-defense technique and one for the contact that occurred during his demonstration of the fourth self-defense technique. The jury acquitted Wakeman on the count of rape that was based on the contact that occurred during the third self-defense technique demonstration, but convicted him on the count of rape that was based on the contact that occurred during the fourth self-defense technique demonstration.

Wakeman was sentenced to life in prison and timely noted this appeal. His sole assignment of error on appeal is that "Balciunas should not have been accepted as an expert," and therefore, the evidence offered during her testimony should have been excluded.[6]

---

[6] Consistent with the error alleged, Wakeman's challenge is and was to Balciunas' qualifications as an expert. Thus, even if we were to agree that the trial court erred in finding Balciunas qualified, the only portions of her testimony that would be subject to being stricken would be any expert testimony she offered. None of her testimony as a fact witness, including her discussions with L.N., what she observed, and what she did (including the performance of the PERK) would be subject to being stricken. All such fact testimony was the result of things done or observed by Balciunas, and thus, were within her personal knowledge as a fact witness. Given our ultimate conclusion that the trial court did not err in qualifying Balciunas as an expert, we need not address the argument that her fact testimony impermissibly was bolstered by the court's purportedly erroneous qualification decision.

ANALYSIS

"Whether to qualify a witness as an expert rests largely within a trial court's discretion." Spencer v. Commonwealth, 238 Va. 563, 573, 385 S.E.2d 850, 856 (1989). A trial court's decision that a witness is qualified as an expert "will not be disturbed on appeal unless the record clearly shows that the witness was not qualified." Id. at 573-74, 385 S.E.2d at 856.

In general, the qualification of an expert witness is governed by Rule 2:702(a) of the Virginia Rules of Evidence. That Rule provides:

> (i) In a civil proceeding, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
>
> (ii) In a criminal proceeding, expert testimony is admissible if the standards set forth in subdivision (a)(i) of this Rule are met and, in addition, the court finds that the subject matter is beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions.

Va. R. Evid. 2:702(a).

Here, Wakeman does not dispute that a forensic examination of a potential sexual assault victim "is beyond the knowledge and experience of ordinary persons" and that the topic is "such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." In fact, his argument necessarily assumes that even an experienced nurse, let alone the average juror, lacks the relevant knowledge. Accordingly, the requirements of Rule 2:702(a)(ii) were met.

Turning to the requirements of Rule 2:702(a)(i), there is little doubt that Balciunas possessed "scientific, technical, or other specialized knowledge" regarding sexual assault forensic examination. She certainly possessed "a degree of knowledge of [the] subject matter beyond that of persons of common intelligence and ordinary experience . . . ." Justiss v. Commonwealth, 61

Va. App. 261, 270-71, 734 S.E.2d 699, 704 (2012) (quoting Conley v. Commonwealth, 273 Va. 554, 560, 643 S.E.2d 131, 134 (2007)).[7]  In fact, Wakeman conceded at oral argument in this Court that Balciunas possessed more knowledge of this topic than the average person.

Similarly, there can be no dispute that Balciunas' expertise regarding sexual assault forensic examination stems from her "knowledge, skill, experience, training, or education . . . ." Va. R. Evid. 2:702(a)(i).  She has an extensive nursing background, having received a degree in nursing in 2010 and having worked as a nurse since then.  Furthermore, it is undisputed that she had additional education and training regarding the performance of forensic examinations, including completing all of the training necessary to obtain SANE certification.  In addition to this education and training, she has extensive experience in the field, having served in the hospital's forensic nursing program for three years at the time of trial.  At the time of trial, she had been performing forensic nursing examinations unsupervised for three years after having spent a year performing them under supervision.  In short, the record amply demonstrates that Balciunas possessed relevant expertise and that such expertise stemmed from her "knowledge, skill, experience, training, or education . . . ."  Va. R. Evid. 2:702(a)(i).

Acknowledging this, Wakeman asserts that the trial court still erred in accepting Balciunas as an expert.  He notes that, despite her extensive knowledge, training, and experience, she had never taken the SANE certification examination, and therefore, did not carry the formal certification of a SANE.  He argues that the lack of certification required the trial court to deem her unqualified.

Such an argument is inconsistent with the plain text of Rule 2:702(a).  Notably absent from the rule is any requirement that an expert carry a particular certification in order to serve as an expert.  Wakeman recognizes this, but argues that, because there is a reference in the Code of

---

[7] "Common law case authority, whether decided before or after the effective date of the Rules of Evidence, may be . . . considered in interpreting and applying the Rules of Evidence." Va. R. Evid. 2:102.

Virginia to SANEs,[8] it must be that the General Assembly intended for only SANEs to offer expert testimony in sexual assault cases.

It is true that the General Assembly can, by statute, alter the standards for expert qualification found in Rule 2:702(a). See Code 8.01-3(D) ("The General Assembly may, from time to time, by the enactment of a general law, modify or annul any" rule of court promulgated by the Virginia Supreme Court.). By way of example, the General Assembly has created special requirements for expert witnesses in medical malpractice cases, Code § 8.01-581.20, in capital cases where mental retardation is a potential issue, Code § 19.2-264.3:1.2, and in cases involving the civil commitment of sexually violent predators, Code § 37.2-907(A). In those instances where the General Assembly has modified or annulled the requirements of Rule 2:702(a) by statute, "the witness must satisfy those statutory requirements before testifying as an expert." Commonwealth v. Miller, 273 Va. 540, 549, 643 S.E.2d 208, 213 (2007).

Wakeman's argument fails because the General Assembly has not enacted such a statute regarding the qualifications of nurses to testify as experts about forensic examinations in sexual assault cases. The sole statutory reference to SANEs cited by Wakeman has nothing to do with expert testimony, but rather, is a provision of the Drug Control Act that permits SANEs to administer certain medications in certain circumstances. Because the General Assembly has not

---

[8] Wakeman identified one statutory reference to SANEs. Specifically, he cites to Code § 54.1-3408(K), which provides that

> [p]ursuant to an oral or written order or standing protocol issued by the prescriber within the course of his professional practice, such prescriber may authorize registered professional nurses certified as sexual assault nurse examiners-A (SANE -A) under his supervision and when he is not physically present to possess and administer preventive medications for victims of sexual assault as recommended by the Centers for Disease Control and Prevention.

Wakeman has not identified any statute, regulation, rule, or case that even suggests that SANE certification is required before a nurse may testify as an expert in a sexual assault case.

enacted a special expert qualification statute for nurses who are called to testify as experts regarding forensic examinations in sexual assault cases, Rule 2:702(a) governs whether a nurse should be qualified as an expert on the subject.

For the reasons stated above, there was ample evidence in the record to allow the trial court to conclude that Balciunas met the requirements of Rule 2:702(a). Accordingly, the trial court did not abuse its discretion in qualifying her as an expert in sexual assault forensic examination.

CONCLUSION

For the reasons stated above, the trial court did not err in determining that Balciunas was qualified to give expert testimony regarding forensic examinations in sexual assault cases. Accordingly, we affirm the judgment of the trial court.

Affirmed.