# Richmond

## Ernest G. Floyd v. Commonwealth of Virginia.

November 27, 1950.

Record No. 3721.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Robert C. Goad,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

Ernest G. Floyd seeks by this writ of error reversal of a judgment whereby he was convicted of maliciously wounding Lawrence Gilbert, and sentenced to six years confinement in the penitentiary.

The evidence on pertinent issues is in sharp conflict. That for the Commonwealth, stated in the light most favorable to it, is as follows:

Lawrence Gilbert, who was drinking, entered the Tee Tavern, owned and operated by Ernest G. Floyd, on Main street in Lynchburg. Gilbert sat on a stool in the restaurant and ordered a meal, with a bottle of gin, clearly visible, protruding from his pocket. When defendant saw the bottle he ordered Gilbert to leave. An argument followed. Gilbert finally went outside, stood in front of the building and continued for some time to argue and curse. Defendant came out of his place of business, joined Henry Holt, Jr., and while the two walked down the street defendant was heard to say that he was "going to get Gilbert around the corner." Shortly after this statement was made Holt returned to where Gilbert was standing, asked for a drink, and went with him around the corner of 6th and Main streets where defendant, who was waiting, grabbed Gilbert from behind, knocked him down with a heavy leather purse, and beat and kicked him while he was on the ground. One witness for the Commonwealth said that when he came around the corner defendant was standing over Gilbert hitting him with a blackjack. Gilbert tried to get up and run, but defendant hit him again. This testimony tends to prove defendant was guilty of malicious assault.

The testimony for defendant tends to prove that when Gilbert was requested to leave the restaurant he became angry, threw the contents of his plate on the counter, began to curse and abuse defendant, calling him, among other things, a "gray-headed s. o. b." One of Gilbert's friends persuaded him to leave the restaurant. On getting outside he stood by, or leaned against, a parking meter directly in front of the building and continued to curse defendant through the front window. He slapped a young man without provocation and made threats against defendant.

Defendant waited some time hoping that Gilbert would leave, but he continued to raise a disturbance on the outside, quarreling with parties going into the restaurant. Finally defendant determined to get an officer to quell the disturbance. He walked down Main street to the corner looking for an officer. Gilbert followed him down the sidewalk, reached in his pocket and took out a bottle of gin and struck at defendant. A fight ensued and defendant used a leather pouch to protect himself. This testimony tends to prove that defendant acted in self-defense.

In the course of the trial, and while the attorney for the Commonwealth was examining his own witness, Henry Holt, Jr., he informed the court that he was taken by surprise at the testimony of the witness and asked permission to lay a foundation for impeachment. On request of defendant the jury was directed to leave the room. Whereupon the attorney for the Commonwealth informed the court that while he had not talked to Holt before calling him as a witness, two police officers who had talked with him, had given him a memorandum of the statements the witness had made to them. This memorandum made by the police officers and read to the court was as follows:

"Holt says that Floyd called him and asked him if he would tell Gilbert to come on around the corner, that he wanted to see him. Holt stated further that he told Floyd

that Gilbert had just offered him a drink and they would come on around to take the drink. Whereupon he went back to Gilbert and they both walked around the corner of 6th and Main Street headed toward Commerce Street and when they got around on 6th Street Rip Floyd grabbed Gilbert and began beating him with a blackjack. Henry Holt said he did not have any idea that that was what Floyd was going to do and that he was so surprised and shocked he did not know what he did himself but he does know that Floyd hit Gilbert several times and that when Gilbert got up and started back up the street Floyd told him to come on with him and they went around the rear of the Gas Company and into a rear entrance of the Tea Tavern where they both drank a glass of beer and then walked out through the front door in the street."

The court, over objection of defendant, stated that he would permit the attorney for the Commonwealth to ask the witness "as a question of fact did he make those statements. I will charge the jury that they must not accept as a fact those things that he said in that statement; that this is solely to discredit him."

It appears that the attorney for the Commonwealth acted in good faith. He had a right to rely on the information the investigating officers had given him. When it appeared that the testimony of Holt was inconsistent with the oral statements that the officers claimed that he had made to them, and was adverse to the theory of the prosecution, the attorney for the Commonwealth adopted the procedure authorized by Section 8-292 of the 1950 Code. It does not appear that the witness had ever seen the memorandum that the officers had made of his statements to them. Apparently, he knew nothing about it until it was produced by the attorney for the Commonwealth. It was not his statement. He admitted talking to the officers about the case, but he never admitted making certain pertinent statements set forth in the memorandum. Under no circumstances was the memorandum admissible as evidence.

At this stage of the trial, the attorney for the Commonwealth was merely laying the foundation to prove thereafter that the witness had made oral statements inconsistent with his present testimony. When the jury was recalled, and before the attorney for the Commonwealth had asked the witness any questions about his prior inconsistent statements, the court instructed them as if the statements had been proven. It said:

"Gentlemen of the jury the court is permitting the Commonwealth Attorney to *introduce a statement made by the witness* for the purpose of discrediting what the witness has said here on the witness stand by showing, if the Commonwealth can, that he has made a different and inconsistent statement of fact. *Now, in doing that you must not accept that statement as being true. You give the statement no weight at all as to the facts in the statement.* It is solely for the purpose of showing, if the Commonwealth can, that this witness *has made* an inconsistent statement, showing how much weight you shall give his testimony. That is the sole purpose of this. *Don't consider as true what is in the statement. It is introduced to show that the witness has made a different account.* It is for the sole purpose of showing how much credibility you shall attach to what the witness told you this morning." (Italics supplied.)

Immediately after the court had given the jury this instruction the attorney for the Commonwealth produced the statement and used it as a memorandum in formulating his question to the witness, Holt, quoting the statement.

The witness, in answer to the question, stated that he had not made all of the statements which the attorney for the Commonwealth had read to him. He did not remember telling the officers that defendant had told him to get Gilbert to come around the corner. He did not tell them that he and Gilbert went around the corner of 6th and Main streets before Gilbert was attacked. He said that the fight started on the corner, and not around it. In answer to a question propounded by the court as to whether his testi-

mony was not to the effect that he neither denied nor affirmed telling the officers what was in the statement, he said "That is right, because I really don't know. Like I say, I was drunk."

The instruction of the court and the reading of the statement in the presence of the jury, under the circumstances disclosed, were well calculated to lead the jury to believe and accept as a fact that the witness had made the statements to the officers. At this stage of the trial the instruction of the court was premature. If the officers had been called and testified that the witness had made to them the statements set forth in the memorandum; then the court should have given the jury a proper instruction telling them the purpose for which the testimony of the officers was admitted. However, there should be no statement in such an instruction to the effect that the witness had actually made the statements to the officers, as the jury, in passing upon the credibility of the witness, had a right to accept his present testimony and reject the testimony of the officers. Testimony tending to prove that a witness has made prior inconsistent statements, and laying the foundation for introduction of such testimony, are two separate and distinct matters.

The Attorney General contends that in conformity with the statute the proper foundation was laid for the impeachment of the witness, but he was not impeached; that the attorney for the Commonwealth simply asked the witness whether he made the statements, and that the witness neither affirmed nor denied making them, and that there the matter was left to the jury without prejudice to defendant.

The record does not support this contention. The answers of the witness to various questions regarding the statements were, in effect, a denial that he made the most pertinent of them. He testified that he was too drunk to remember all that he said to the officers. Yet, without any proof that he had made prior inconsistent statements, the court stated to the jury that it "was permitting the Common-

wealth Attorney to *introduce a statement made by this witness.*" (Italics supplied.) Under the circumstances, this was highly prejudicial to defendant.

The facts in *Trout v. Commonwealth*, 167 Va. 511, 188 S. E. 219, relied upon by the Commonwealth, are distinguishable from the facts in the instant case. In the *Trout Case* the attorney for the Commonwealth (as was done in this case) obtained permission of the court to lay the foundation to prove by other parties that certain witnesses had made statements inconsistent with their present testimony, but failed to introduce proof that such statements were actually made. In passing upon this question Mr. Justice Spratley, speaking for the court, said:

"It was further argued that no witnesses were produced to contradict the testimony of these three witnesses. This frequently happens in the trial of cases, and certainly no ruling exists that would penalize the mere failure to successfully contradict the witness, by granting a new trial where no other error exists. In the instant case, the witnesses were positive in their testimony on the stand, and the failure to contradict them by other witnesses, left their testimony to be considered for its full value by the jury, and this cannot be said to be unfavorable to the accused. Usually counsel for the accused take advantage of these circumstances to make full comment to the jury on the failure of the Commonwealth to contradict the witnesses."

The force of any argument the attorney for the accused might have used before the jury to the effect that the Commonwealth had failed to prove the witness had made prior inconsistent statements was absolutely nullified by the action of the attorney for the Commonwealth and the instruction of the court to the jury. The impeachment of the witness in the minds of the jury was complete, not by pertinent testimony, but by the court assuming in its instruction to the jury that the witness had made prior inconsistent statements.

Defendant further contends that the trial court committed

reversible error in giving Instruction No. 4 for the Commonwealth, which reads as follows:

"The Court instructs the jury that any object or instrument other than nature's weapons that is used in wounding or doing serious bodily injury to a person is a deadly weapon if it is likely to produce death or great bodily injury when used in a manner and under the circumstances in which it was used."

Doctor Harris, who treated Lawrence Gilbert, testified that he found four jagged lacerations, to the bone, on Gilbert's head, two above the hairline, each an inch long, one about a half inch long on the ear, and another an inch long on the temple. They were made with a blunt instrument and it was necessary to take 12 to 14 stitches. All of them left, or will leave, permanent scars. The two lacerations above the hairline will not be visible as they will be covered by hair. In addition, Gilbert had abrasions on the left shin two or three inches long and two inches wide. It is conceded that the wounds were inflicted with a leather purse, nine inches long, four inches wide, one and a half inches thick, containing 19 silver dollars, and weighing one pound, ten ounces. To the purse was attached a wrist strap similar to one used on a police club.

This instruction, as applied to the testimony for the Commonwealth, was, in effect, approved by this court in an opinion by Mr. Justice Gregory in *Pannill* v. *Commonwealth*, 185 Va. 244, 38 S. E. (2d) 457, where he said:

"Unquestionably in Virginia malice may be inferred from the deliberate use of a deadly weapon in the absence of proof to the contrary. * * * There are deadly weapons such as a loaded pistol, a dirk, or an axe, which the court may pronounce as a matter of law a 'deadly weapon.' On the other hand, a weapon may not be *per se* deadly, yet the vicious and cruel use of it may be the determinative factor in pronouncing it deadly. The mere fact that death was produced by the weapon does not establish its character as deadly.

"In 40 C. J. S., Homicide, sec. 25, a deadly weapon is defined thus:

" 'A deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character.' * * *

"Generally, unless a weapon is *per se* a deadly one, the jury should determine whether it, and the manner of its use, places it in that category, and the burden of showing these things is upon the Commonwealth."

The instruction applies the principles set forth in the foregoing authorities.

We have examined the two remaining assignments of error and find no merit therein.

For the error of the trial court in assuming in its instruction to the jury that the witness had actually made prior inconsistent statements, the judgment is reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*