COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Felton, Judges Humphreys and Chafin
Argued at Salem, Virginia


JOHNATHON LANE JUSTISS, A/K/A
  JONATHAN LANE JUSTISS

                                                              OPINION BY
v.      Record No. 2600-11-3                    JUDGE ROBERT J. HUMPHREYS
                                                         DECEMBER 11, 2012

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF BRISTOL
Larry B. Kirksey, Judge

        David B. Childers for appellant.

        Steven A. Witmer, Senior Assistant Attorney General (Kenneth T.
        Cuccinelli, II, Attorney General, on brief), for appellee.


        Johnathon Lane Justiss ("Justiss") was convicted of entering a bank while armed with a

deadly weapon with the intent to commit larceny in violation of Code § 18.2-93, conspiracy to

commit bank robbery in violation of Code § 18.2-22, use of a firearm in the commission of a

robbery in violation of Code § 18.2-53.1, wearing a mask in violation of Code § 18.2-422, and

grand larceny in violation of Code § 18.2-95 following a jury trial in the Circuit Court of the City

of Bristol ("trial court").  On appeal, Justiss only challenges his convictions for entering a bank

while armed with a deadly weapon with the intent to commit larceny and the conspiracy charge

related to that offense.[1]  His arguments on appeal are that (1) "[t]he jury improperly determined

the BB gun used in the commission of the bank robbery was a deadly weapon and the

Commonwealth failed to prove that it could cause serious bodily injury or death by the BB gun's

_____

        [1] Justiss contends that if the charge for entering the bank is overturned, the conspiracy
charge which relies on that offense must be overturned as well.

character or the nature of its use," (2) "[t]he trial court abused its discretion by allowing the Commonwealth to introduce, and the jury to view, the packaging for the BB gun found at [Justiss's] residence though the packaging contained printed language that is inadmissible hearsay and does not fall into any of the exceptions to the hearsay rule," and (3) "[t]he trial court abused its discretion by determining a police officer, Detective Mike Arthur, to be an expert on BB guns though he had no specific training or education regarding BB guns, had little experience with BB guns in general and had never shot the BB gun that was introduced into evidence[, and the] trial court further abused its discretion by allowing that same witness to testify to the ultimate issue of fact, namely whether the BB gun used at the bank was a deadly weapon; a determination that can only be made by the finder of fact." For the reasons that follow, we reverse.

## I. Background

On October 19, 2010, Justiss entered the Highlands Union Bank on Commonwealth Avenue in Bristol, Virginia wearing a mask and armed with a BB gun. He quickly approached Monica Tittle's ("Tittle") teller desk while displaying the BB gun. Justiss looked over to the customer who was at the next teller's station and told him "do not be a hero." Then, he told Tittle that he wanted all of her money, and he did not care if she triggered the alarm. Tittle triggered the alarm and placed $2,700 in assorted currency on the counter. Justiss snatched up the money and fled the bank. During the encounter, which lasted around a minute, Justiss had the BB gun prominently displayed in his hand. While he never pointed the gun directly at Tittle, he did raise the gun and wave it around at one point.

Following the incident, a Bristol grand jury indicted Justiss for entering a bank armed with a deadly weapon with intent to commit larceny, use of a firearm while committing bank robbery, wearing a mask, grand larceny, and conspiracy to commit bank robbery. Prior to trial

on these charges, Justiss filed a motion *in limine* to exclude the packaging for the gun and its manual from the evidence.[2] Justiss's counsel objected to their admission based on his contention that they contained impermissible hearsay, and "ask[ed] the Court to exclude the packaging, or, if not to exclude the packaging, to simply cut out the language on the packaging . . . ." The trial court granted the motion with respect to the owner's manual, but partially denied the motion with respect to the packaging:

> the exterior packaging is another circumstance altogether. While the content of any statement made thereon may perhaps be in the nature of an opinion of some sort, that's not the purpose for which it is intended to be offered into evidence. As the Commonwealth advises, its intention is to establish the identity with regard to the item involved and to be presented here at trial from the time of its acquisition or purchase, if you will, at Wal-Mart until discovered subsequently to that. And for the purposes of that identification, the Court will allow the exterior labeling to be admitted.

Justiss subsequently pled not guilty to the offenses, and was tried by a jury. At trial, the Commonwealth introduced the packaging into evidence over the renewed objection of Justiss's counsel, which the trial court overruled. At that time, the trial court instructed the jury not to consider any writing on the packaging. In addition, the trial court gave the jury a limiting instruction, which Justiss's counsel drafted, stating, "The writing, including all words and numbers on the packaging for the Crosman BB gun, is inadmissible hearsay and shall not be considered as evidence against the Defendant."

At trial, the Commonwealth also elicited testimony from Detective Mike Arthur ("Detective Arthur"). Detective Arthur was involved with the investigation of the bank robbery, and testified as to that aspect at the trial. In addition, the Commonwealth sought to qualify him

---

[2] As the bank robber was masked, identity was a key issue at trial. Police found the packaging for the BB gun in Justiss's house, and it was a critical part of the Commonwealth's theory of the case linking Justiss to the robbery. The Commonwealth also presented a video of Justiss taking an identical box for a BB gun from a Wal-Mart just days before the robbery.

as an expert witness on firearms. Justiss opposed qualifying Detective Arthur as an expert on firearms on the basis that the weapon used was a BB gun.[3]

In support of its attempt to qualify the witness as an expert on firearms, the Commonwealth elicited testimony from Detective Arthur that he had been a police officer for nineteen years. In that capacity, he had been certified as a firearms instructor since 2001, and was currently a member of the SWAT[4] team. In order to become a firearms instructor, Detective Arthur had to go through an initial class, which qualified him as a general instructor, and an additional firearms instructor course that took 44 hours to complete. He is also required to undergo recertification every two years in order to maintain his status as a firearms instructor.

Detective Arthur also testified that he owned and operated an outdoor hunting and fishing store for four years. The store sold guns as part of its business, including handguns, rifles, shotguns, air rifles, and air pistols. The store sold the same types of BB gun as the one Justiss used during the bank robbery, and Detective Arthur testified that he was familiar with that type of weapon.

The Commonwealth then offered Detective Arthur as an expert of firearms, and Justiss's counsel was permitted to engage the witness in *voir dire* on the issue of his expertise. During *voir dire*, Detective Arthur testified that he considered himself an expert on BB guns just as he would on regular firearms. He explained that, as between "regular guns" and BB guns, "[t]he components are basically the same. Just the projectile is launched differently. It's air operated pneumatic rather than powder and primer." However, he admitted that he had no prior training

---

[3] Justiss's counsel objected, stating, "We're talking about a BB gun. [Detective Arthur] simply could not give, sufficient answers as to a BB gun, in the defendant's view, to be considered an expert." During *voir dire*, Justiss's counsel conceded that Detective Arthur would be an expert on "real guns, long guns, [and] pistols that shoot actual bullets," but challenged his expert status on BB guns.

[4] SWAT stands for Special Weapons and Tactics.

in BB guns, nor had he taught classes on BB guns. He testified that he had last shot a BB gun about a year prior to the trial.

Detective Arthur then got into the specifications of BB guns, and explained that they can have muzzle velocities "surprisingly similar" to those of "real guns." Specifically, both hunting rifles and BB guns can have muzzle velocities of 1,200 feet per second. The muzzle velocity of the BB gun Justiss used is 600 feet per second.[5] He went on to explain that some BB guns can shoot both BBs and pellets.[6] BBs themselves are .17 inches in diameter and are made of ball bearings, and the pellets that BB guns can shoot are the same diameter and are made of lead and brass. A pellet is "more of a hunting round because it is softer than the BB itself and it will mushroom on impact. So, you can hunt with it for small game; groundhogs, rabbits, squirrels."

Following *voir dire*, the Commonwealth again moved to qualify Detective Arthur as an expert on firearms, and the trial court granted the motion over the objection of Justiss's counsel. Subsequently, Detective Arthur testified that he was personally aware of two previous incidents involving death or serious bodily injury from a BB gun injury. First, a father shot his eight-year-old son accidentally with a BB gun. The BB hit the child in the eye and entered his brain, and the child died as a result. Second, there was an incident where an individual was shot with a BB gun and the BB "entered through his chest, collapsed his lung, and rested next to his spine." As a result, he suffered from a collapsed lung and was admitted to the ICU. Detective Arthur also testified that there were on average four deaths a year attributed to air guns, although Detective Arthur did not mention how large of a geographical area this statistic accounts for.

---

[5] Following *voir dire*, Detective Arthur testified that the muzzle velocity of his sidearm, a .45 caliber pistol, is 875 feet per second in comparison.

[6] The record does not indicate whether the BB gun used in this case can shoot pellets.

While Detective Arthur was testifying, the Commonwealth initiated the following exchange:

> [Commonwealth's Attorney]: Detective Arthur, in your position as an expert, would you consider this particular gun that was found to be a deadly weapon?
>
> [Detective Arthur]: Yes
>
> [Justiss's Counsel]: Your Honor, I'm going to object. That's to the ultimate issue. That's consideration for the fact-finder only.
>
> [Trial Court]: Objection is sustained. Ladies and Gentlemen, if there was a response, disregard it.
>
> [Commonwealth's Attorney]: Detective, let me ask you a different way. In your position as an expert, does this gun that was found have the capacity to cause serious bodily injury or death?
>
> [Justiss's Counsel]: Your Honor, same thing. He's asking the same question a different way.
>
> [Trial Court]: Overruled.
>
> [Detective Arthur]: Yes.

Following the Commonwealth's case-in-chief, Justiss withdrew his not guilty pleas and pled guilty to the charges of use of a firearm in the commission of a robbery in violation of Code § 18.2-53.1, wearing a mask in violation of Code § 18.2-422, and grand larceny in violation of Code § 18.2-95. Subsequently, he rested, and the jury found him guilty of entering a bank while armed with a deadly weapon with the intent to commit larceny in violation of Code § 18.2-93 and conspiracy to commit bank robbery in violation of Code § 18.2-22. He then noted this appeal.

## II. Analysis

### A. Detective Arthur's Testimony

We first address Justiss's assignment of error relating to the admissibility of Detective Arthur's testimony. Justiss's assignment of error essentially contains two parts. First, Justiss

contends that the trial court erred in qualifying Detective Arthur as an expert. Second, Justiss contends that the trial court erred in allowing Detective Arthur to opine as to the ultimate issue in this case.

Addressing the first issue, we note the relevant standard of review, which dictates that "'[t]he question of the qualification of a witness to speak as an expert lies largely in the discretion of the trial court, whose judgment will not be reversed unless it clearly appears that the witness was not qualified.'" Freeman v. Commonwealth, 223 Va. 301, 315, 288 S.E.2d 461, 469 (1982) (quoting Jordan v. Commonwealth, 207 Va. 591, 598, 151 S.E.2d 390, 395 (1966)).

"It is axiomatic that in order to qualify to give expert testimony a witness must possess sufficient knowledge, skill, or experience regarding the subject matter of the testimony to assist the trier of fact in the search for truth." Fitzgerald v. Commonwealth, 273 Va. 596, 601, 643 S.E.2d 162, 164 (2007).

> Generally, to qualify as an expert the witness needs only to have a degree of knowledge of a subject matter beyond that of persons of common intelligence and ordinary experience so that the witness' opinion will have value in assisting the trier of fact in understanding the evidence or determining a fact in issue.

Conley v. Commonwealth, 273 Va. 554, 560, 643 S.E.2d 131, 134 (2007). "An expert witness may acquire the requisite knowledge of a subject matter through experience and observation in a variety of ways, including participation in a vocation, without formal training or education." Id.

During trial, the Commonwealth tendered Detective Arthur as an expert on firearms, and the trial court ultimately admitted him as such. While there is ample evidence in the record supporting the trial court's qualification of Detective Arthur as an expert on firearms, an expert's testimony must be relevant to an issue in the case. Utz v. Commonwealth, 28 Va. App. 411, 423, 505 S.E.2d 380, 386 (1998). In this case, any opinion testimony on firearms is irrelevant to any issue before the jury. As the Commonwealth conceded at oral argument on appeal, the weapon

at issue in this case does not fit within the confines of a "firearm." Webster's Dictionary defines a firearm as "a weapon from which a shot is discharged by gunpowder." Webster's Third New International Dictionary 854 (1993); see also Black's Law Dictionary 710 (9th ed. 2009) (defining a firearm as "[a] weapon that expels a projectile (such as bullet or pellets) by the combustion of gunpowder or other explosive"). As a BB gun expels projectiles through the use of compressed gas, and not gunpowder or other explosive, it is clearly not a firearm.

However, while the trial court's classification of Detective Arthur as an expert in firearms was error, on this record, such error was harmless as a matter of law. Detective Arthur demonstrated the requisite knowledge to be qualified as an expert witness on air powered guns through his extensive testimony on BB guns and air guns in general. An error is harmless "'[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect.'" Atkins v. Commonwealth, 272 Va. 144, 154, 631 S.E.2d 93, 98 (2006) (quoting Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001)).

Here, Detective Arthur demonstrated an acute knowledge of BB guns at trial. He testified that he sold BB guns as the owner and operator of an outdoor sporting goods store, and the store sold the same type of BB gun as the one used in the robbery. Detective Arthur further testified that he was familiar with the type of weapon used in the robbery. He also testified extensively as to the specifications of BB guns, including their muzzle velocities and the different varieties of projectiles they can shoot. Thus, while the trial court erred in qualifying Detective Arthur as an expert on firearms rather than BB guns or air powered guns, any error was harmless as Detective Arthur demonstrated the requisite knowledge to be classified as an expert on BB guns, and his improper classification as an expert on firearms could have only had a slight effect on the jury, if any.

Justiss's argument that Detective Arthur should not have been qualified as an expert because he had no prior training in BB guns, did not teach classes on BB guns, and had not shot a BB gun in over a year does not alter our analysis. Detective Arthur clearly had "a degree of knowledge of a subject matter beyond that of persons of common intelligence and ordinary experience so that [his] opinion [had] value in assisting the trier of fact in understanding the evidence or determining a fact in issue." Conley, 273 Va. at 560, 643 S.E.2d at 134. While the deficiencies in Detective Arthur's experience enumerated by Justiss may have an effect on the weight the jury ultimately afforded to his testimony, they do not preclude him from being qualified as an expert.

We now turn to the issue of whether the trial court erred in allowing Detective Arthur to testify as to the ultimate issue in this case. Limitations on expert testimony are well settled in the law. We have explained that

> [i]n general, a witness who by education, training or experience has knowledge beyond that of most lay men, may be qualified before the court as an expert witness and allowed to state an opinion to the factfinder on matters not within their common knowledge or experience. Conversely, "[e]xpert testimony concerning matters of common knowledge or matters as to which the jury are as competent to form an opinion as the witness is inadmissible. Where the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom, the opinion of an expert based upon such facts and circumstances is inadmissible."

Callahan v. Commonwealth, 8 Va. App. 135, 138-39, 379 S.E.2d 476, 478 (1989) (quoting Coppola v. Commonwealth, 220 Va. 243, 252, 257 S.E.2d 797, 803-04 (1979), cert. denied, 444 U.S. 1103 (1980)). Furthermore, it is paramount that an expert witness "'cannot give his opinion upon the precise or ultimate fact in issue, which must be left to the jury or the court trying the case without a jury for determination.'" Llamera v. Commonwealth, 243 Va. 262, 264-65, 414 S.E.2d 597, 598 (1992) (quoting Webb v. Commonwealth, 204 Va. 24, 33, 129 S.E.2d 22, 29

(1963)).  An expert must not provide such an opinion, because testifying as to the ultimate fact in issue "invades the function of the fact finder."  Id. at 264, 414 S.E.2d at 598.[7]

In this case, the trial court allowed the Commonwealth to ask Detective Arthur the following question:  "[i]n your position as an expert, does this gun that was found have the capacity to cause serious bodily injury or death?"  The trial court allowed Detective Arthur to answer the question in the affirmative over the objection of Justiss's counsel.

Under Code § 18.2-93, the Commonwealth must prove beyond a reasonable doubt that a "person, armed with a deadly weapon, . . . enter any banking house, in the daytime or in the nighttime, with intent to commit larceny of money, bonds, notes, or other evidence of debt therein . . . ."  Our case law defines "'[a] deadly weapon [as] one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character.'"  Cox v. Commonwealth, 218 Va. 689, 691, 240 S.E.2d 524, 526 (1978) (quoting Floyd v. Commonwealth, 191 Va. 674, 684, 62 S.E.2d 6, 10 (1950)).  This test was presented to the jury by way of an instruction that read, "[a] deadly weapon is any object or instrument, not part of the human body, that is likely to cause death or great bodily injury because of the manner and under the circumstances in which it was used."

The language of the test and the jury instructions are virtually identical to the question posed by the Commonwealth, and thus it is clear that the Commonwealth elicited an impermissible opinion as to a fact in issue in the case that was in the exclusive province of the jury to resolve:  whether the BB gun constituted a deadly weapon.  On appeal, the

---

[7] Although the Virginia Rules of Evidence were not in effect at the time of the trial in this case, we note that they incorporate the common law rule prohibiting testimony on the ultimate issue in fact in criminal proceedings.  See Virginia Rules of Evidence 2:704(b) (stating in relevant part, "In criminal proceedings, opinion testimony on the ultimate issue of fact is not admissible.").

Commonwealth argues that this was not testimony as to the ultimate issue, because the Commonwealth did not inquire whether the BB gun was likely to cause death or great bodily injury *because of the manner in which it was used*. However, the omission of this additional language constitutes a distinction without a difference. "Virginia's appellate courts have, for many years, applied the rule [prohibiting expert testimony as to the ultimate issue in fact] to bar testimony about factual conclusions, *where those conclusions are central to the decision in the case*." Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 13-10[b] (7th ed. 2012); see e.g. Ramsey v. Commonwealth, 200 Va. 245, 251-52, 105 S.E.2d 155, 159-60 (1958) (holding that an expert's testimony that a fire was "incendiary" was impermissible in a trial for arson), Llamera, 243 Va. 262, 414 S.E.2d 597 (holding that expert testimony that the drugs at issue in the case were "packaged that way for distribution" and that the quantity of drugs "would suggest that the owner of the cocaine was a person who sold cocaine" was impermissible in a trial for possession with the intent to distribute). Thus, although the question posed did not recite the test for a deadly weapon verbatim, the question, coupled with the answer it ultimately invoked placed before the jury an opinion as to how they should resolve the central factual issue in the case, and thus the question and its answer invaded the province of the jury.

Therefore, we hold that the trial court erred in allowing Detective Arthur to testify as to the ultimate issue, and we must reverse the judgment below and remand for further proceedings consistent with this opinion. However, we must address the remaining assignments of error, as they may arise again on remand. See Chapman v. City of Virginia Beach, 252 Va. 186, 192, 475 S.E.2d 798, 802 (1996); Commonwealth v. Garrett, 276 Va. 590, 605, 667 S.E.2d 739, 748 (2008); Holmes v. Levine, 273 Va. 150, 158, 639 S.E.2d 235, 239 (2007).

B.  The BB Gun Packaging

On appeal, Justiss also alleges that the trial court abused its discretion in allowing the BB gun packaging into evidence.  "'The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion.'"  Jones v. Commonwealth, 50 Va. App. 437, 446, 650 S.E.2d 859, 863 (2007) (quoting Blain v. Commonwealth, 7 Va. App. 10, 16-17, 371 S.E.2d 838, 842 (1988)).  In this case, the trial court admitted the packaging into evidence despite holding that it contained writing that constituted inadmissible hearsay.[8]

The question this issue presents is similar to the one at issue in Shurbaji v. Commonwealth, 18 Va. App. 415, 444 S.E.2d 549 (1994).  In that case, the appellant was convicted of possession of cocaine with intent to distribute.  The cocaine at issue was found in the bedroom of the appellant's residence, and his defense was that he spent his time living in another apartment and that he did not live in the searched residence.  At trial, the Commonwealth introduced utility bills found in the bedroom of the searched residence that were addressed to the appellant.  The appellant challenged their admissibility under a hearsay objection, and this Court upheld their admissibility.  In reaching our holding, we stated

> To constitute hearsay the documents must be "written evidence[] of a statement made out of court, the statement being offered as an assertion *to show the truth of matters asserted therein*, and thus resting for its value upon the credibility of the out-of-court asserter."  The challenged documents in this case were not offered for the truth of the matter asserted therein.  The utility bills were used as circumstantial evidence that appellant received or stored his property, including his correspondence, in the master bedroom. It was irrelevant what the utility bills "asserted therein."  Rather, the mere existence of the bills in the master bedroom tended to prove that appellant controlled the room, and that the cocaine and

_____

[8] We note that the issue of whether the package contained inadmissible hearsay is not before this Court, and thus we assume for the purposes of this appeal that the writing on the packaging did, in fact, constitute inadmissible hearsay.

- 12 -

> paraphernalia found there belonged to him. Accordingly, the bills
> were not hearsay and were properly admitted into evidence.

Id. at 418-19, 444 S.E.2d at 551 (emphasis in original) (internal citations omitted) (quoting

Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977)).

In this case, the packaging of the BB gun was used to establish the identity of the man

who committed the bank robbery. Police found the packaging of the gun in Justiss's house, and

the Commonwealth presented evidence that showed Justiss taking an identical box for a BB gun

from Wal-Mart prior to the robbery. Thus, the purpose of the Commonwealth admitting the

packaging into evidence at trial was to help identify Justiss as the masked man who robbed the

bank. Although the packaging contained statements that the trial court found to be hearsay, the

Court admitted the packaging for a limited purpose, and properly instructed the jury not to

consider the writing as evidence. We presume that the jury followed such a limiting instruction.

Jones, 50 Va. App. at 451-52, 650 S.E.2d at 866 ("'When evidence that might otherwise be

hearsay is admitted for a limited, non-hearsay purpose, the trial court must instruct the jury that

they are to consider the evidence for the specific limited purpose; where such a limiting

instruction is given, we presume that the jury followed that instruction.'" (quoting Hanson v.

Commonwealth, 14 Va. App. 173, 187, 416 S.E.2d 14, 22 (1992))). Thus, we find that the trial

court did not abuse its discretion in allowing the Commonwealth to introduce, and the jury to

view, the packaging for the gun.

## C. Deadly Weapon under Code § 18.2-93

Finally, Justiss contends that the jury was wrong in finding that his BB gun constituted a

deadly weapon under Code § 18.2-93. "Whether an instrument is a deadly weapon is a question

of fact." Inge v. Commonwealth, 39 Va. App. 85, 87, 570 S.E.2d 869, 870 (2002).

> Appellate courts defer to the findings of fact made by a jury or a
> trial judge at a bench trial if there is evidence to support them and
> will not set a judgment aside unless it appears from the evidence

- 13 -

> that the judgment is plainly wrong. That deference applies not only to findings of fact, but also to any reasonable and justified inferences the fact-finder may have drawn from the facts proved.

Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63-64 (2010) (internal citations omitted). Thus, appellate courts "view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth," as the prevailing party below. Inge, 39 Va. App. at 86, 570 S.E.2d at 870.

As discussed in the previous section, "'[a] deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character.'" Cox, 218 Va. at 691, 240 S.E.2d at 526 (quoting Floyd, 191 Va. at 684, 62 S.E.2d at 10). Put another way, "[a] deadly weapon is an instrument designed and constructed to inflict death or great bodily harm and used in that manner." Inge, 39 Va. App. at 87, 570 S.E.2d at 871. Thus, "'unless a weapon is per se a deadly one, the jury should determine whether it, and the manner of its use, places it in that category, and the burden of showing these things is upon the Commonwealth.'" Cox, 218 Va. at 691, 240 S.E.2d at 526 (quoting Floyd, 191 Va. at 684, 62 S.E.2d at 10).

Even without Detective Arthur's testimony that the BB gun had the capability to cause death or serious bodily injury, there was sufficient evidence in this case for a fact finder to conclude that the BB gun was a deadly weapon. The BB gun operates by firing a .17 caliber projectile using compressed air. The BB gun used in this case fires its projectiles with a muzzle velocity of up to 600 feet per second. Detective Arthur testified that his own sidearm, a .45 caliber pistol, had a muzzle velocity of 875 feet per second. He also testified that there are four deaths annually from air guns, and he personally had knowledge of two incidents involving BB guns which resulted in either death or serious bodily injury. In the first incident, a child was shot

- 14 -

in the eye with a BB, and the BB penetrated his brain, killing him.  In the second incident, an individual was shot with a BB, and the BB penetrated his chest, puncturing his lungs and resting next to his spine.  As a result, the individual ended up in the ICU.  Under this record, there is ample evidence to support the jury's finding that the BB gun was a deadly weapon, and thus, we hold that the fact finder was not plainly wrong in reaching that conclusion.

### III.  Conclusion

For the reasons stated above, we reverse and remand this case for a new trial in accordance with this opinion should the Commonwealth be so advised.

<u>Reversed and remanded.</u>