COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Beales and Athey
Argued by videoconference

LEMAR JASON McDANIEL, JR.

                                                        OPINION BY
v.      Record No. 0153-20-2            CHIEF JUDGE MARLA GRAFF DECKER
                                                        JUNE 29, 2021

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Clarence N. Jenkins, Jr., Judge

Daniel W. Hall (Law Office of Daniel W. Hall, on brief), for
appellant.

A. Anne Lloyd, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Lemar Jason McDaniel, Jr., appeals his convictions for second-degree murder, use of a

firearm in commission of a felony, and concealment of a body.  The appellant argues that the

trial court erred by admitting expert testimony about blood spatter evidence.  For the reasons that

follow, we conclude that the trial court acted within its discretion by admitting the testimony.

Consequently, we affirm the convictions.

I.  BACKGROUND[1]

This case arises from the death of Devin Harrison.  She and the appellant were involved

in a romantic relationship for about four months, and he lived with her for a time at her home.

---

[1] In accordance with familiar principles of appellate review, the facts are recited in the
light most favorable to the Commonwealth, as the prevailing party at trial.  Lambert v.
Commonwealth, 298 Va. 510, 512 (2020).

Harrison was last seen alive on July 30, 2018. On that day, the victim and the appellant went to a store together around 11:00 a.m.[2] During lunchtime, Harrison's next-door neighbor heard Harrison arguing from inside her home. She heard only Harrison's voice and did not hear the voice of the person with whom she argued. Later that same afternoon, a different neighbor saw the appellant in the street by the victim's car. He was "messing with" clothes in the back of the vehicle.

That same day, when Harrison went missing, her mother received a text from her mobile phone number indicating that she and the appellant had ended their relationship. The victim's mother expected Harrison to come by her house that day, but Harrison never did. Her mother sent Harrison text messages repeatedly throughout the next day, July 31, 2018, but received no response. Harrison's father called the police and reported her missing.

On the afternoon of July 31, 2018, Harrison's parents went to her home to check on her welfare. While they were there, the appellant met them outside the house. The victim's father forced open the back door and let the mother and the appellant inside. Chairs in the dining room had been overturned, the house was "tor[n] up," and there was a mop and a bucket in the hallway. The house smelled of bleach or a cleaning solvent. Despite the apparent attempt at cleaning, some blood was still in the house, including a large amount of Harrison's blood on her mattress. Harrison was nowhere in the house. Her car was also missing, and her trash can was gone from the back of the house.

Harrison's father described the appellant's demeanor as "nonchalant" while they searched the house for her. During the search, the father threatened to kill the appellant if he had harmed Harrison, but the appellant denied any wrongdoing. After that conversation, the appellant entered Harrison's bedroom crying. He encountered her mother there and stopped crying after

_____

[2] Their images were captured on store security video footage and admitted into evidence.

she asked why he would be crying if he had not done anything wrong. At around 3:00 p.m., Harrison's parents drove the appellant to the police station for an appointment and left him there.

After parting ways with the appellant, Harrison's mother received multiple text messages from Harrison's phone number. The first stated only "Mom," and the second was "I need your help." That evening, she received another text from Harrison's phone number stating that she had cut herself badly, a man had helped her, and that he had driven her to Pittsburgh. Later text messages indicated that Harrison was somewhere in Petersburg but, according to the text, Harrison did not know precisely where she was and needed help. Harrison's mother found this message "unusual" because Harrison was familiar with Petersburg from formerly living there. Previously, the victim and her mother had established a code of texting the word "brown" in case of trouble, and the victim had used the signal with her mother before. However, none of the July 31, 2018 texts purportedly from Harrison included the word "brown," suggesting that she was not actually the person sending them.

Later that same day, the police found Harrison's dead body in her back alley in a trash can a few houses from her residence. A garbage bag found beneath the body contained documents related to court proceedings involving the appellant. The documents included an arrest warrant for damaging Harrison's car window, an arrest warrant for assault and battery of Harrison, a protective order for Harrison against the appellant, the appellant's recognizance bond order for him to appear for a July 31, 2018 hearing, and a subpoena for Harrison to appear in court as a witness in the appellant's assault and battery case.

That same night, the police went to the appellant's home. The appellant showed the officers around the house. In an upstairs bedroom, the police noticed a pair of white tennis shoes with what appeared to be blood on them. At this time, the appellant denied knowing that

Harrison was missing.  He told the police that he had not seen her in four days.[3]  The appellant also said that he had spoken with the victim online four days prior and she threatened to harm herself.

At trial, the Commonwealth introduced Angie Witt, a special agent with the Virginia Department of State Police, as an expert witness.  Witt, employed by the state police since 1993, testified to her training in the field of blood spatter analysis and prior instances in which she had qualified to testify as an expert witness in that field.  Witt based her conclusions in this case on her examination of photographs taken by a crime scene technician.  The appellant made a motion to exclude Witt's testimony.  The trial court found that Special Agent Witt qualified as an expert in the field of blood spatter based upon her education, training, and experience.  The court further concluded that the subject matter was beyond the knowledge and experience of an ordinary person such that expert testimony was appropriate.  Witt gave three opinions based on the evidence.  First, she concluded that the blood on the appellant's shoe had dropped from a nearly ninety-degree angle above it based on the round shape of the bloodstain.  Second, Witt opined that the mattress had a saturation stain from a large amount of blood.  Third, she explained that the blood in the car was "transfer[red]," meaning that something with blood on it came into contact with the vehicle.

The Commonwealth introduced evidence that DNA testing of the blood on one of the shoes and on the mattress indicated that it was Harrison's blood on both items.  In addition, it presented testimony that the appellant could not be eliminated as a contributor from the DNA collected from underneath the victim's fingernails.

---

[3] This statement was clearly contradicted by the store security footage of them together the morning of Harrison's disappearance.

On the day that the victim's body was found, when speaking with the appellant, Detective James Higgins of the City of Richmond Police Department noticed scratches on his body. At a later police interview, the appellant denied killing Harrison and suggested that the blood got on his shoe when he walked through her house with her parents. He also claimed that the last time he had spoken with the victim was about a week prior to her death. At the time of Harrison's death, the appellant was under court order to avoid all contact with her.

The Commonwealth's theory of the case was that the appellant killed Harrison so she could not testify against him in court the following day. The prosecutor argued that the blood dripped on the appellant's shoe as he moved the body.

The jury convicted the appellant of second-degree murder, use of a firearm in the commission of a felony, and concealment of a body, in violation of Code §§ 18.2-32, -53.1, and -323.02. The trial court imposed the jury's sentence of forty-four years in prison.

## II. ANALYSIS

The appellant argues that the trial court abused its discretion by permitting Special Agent Witt to testify as an expert witness on blood spatter evidence. He sets forth two assignments of error that relate to three arguments. First, he contends that Witt was not qualified to testify as an expert in blood spatter. Second, he argues that the Commonwealth failed to establish that she had an adequate background to render an opinion based on photographs. Third, he suggests that the foundation for her analysis was based in part on facts not in evidence.

"The admission of expert testimony is committed to the sound discretion of the trial judge," and the appellate court will not reverse that court's decision unless it "has abused its discretion." Brown v. Corbin, 244 Va. 528, 531 (1992); see Wakeman v. Commonwealth, 69 Va. App. 528, 535 (2018), aff'd, 298 Va. 412 (2020). This "deferential standard" means that "a 'trial judge's ruling will not be reversed simply because an appellate court disagrees.'" Campos

v. Commonwealth, 67 Va. App. 690, 702 (2017) (quoting Thomas v. Commonwealth, 44 Va. App. 741, 753, adopted upon reh'g en banc, 45 Va. App. 811 (2005)). Only in those cases in which "reasonable jurists could not differ" does the record support the conclusion that an abuse of discretion occurred. Du v. Commonwealth, 292 Va. 555, 564 (2016) (quoting Grattan v. Commonwealth, 278 Va. 602, 620 (2009)). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." Id. (quoting Sauder v. Ferguson, 289 Va. 449, 459 (2015)).

### A. Expert Qualifications

The appellant argues that Special Agent Witt did not have the necessary background to qualify as an expert in blood spatter analysis. He relies in part on the expert qualifications described in the National Research Council's publication Strengthening Forensic Science in the United States: A Path Forward (2009) [hereinafter SFSUS].

The law in Virginia is clear regarding what is required to admit expert testimony. To present expert testimony in a criminal proceeding, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Va. R. Evid. 2:702(a)(i)-(ii). To qualify as an expert, a witness "needs only to have a degree of knowledge of a subject matter beyond that of persons of common intelligence and ordinary experience so that the witness' opinion will have value in assisting the trier of fact in understanding the evidence or determining a fact in issue." Kilby v. Commonwealth, 52 Va. App. 397, 410 (2008) (quoting Conley v. Commonwealth, 273 Va. 554, 560 (2007)); see also Va. R. Evid. 2:702(a)(ii). "An expert witness may acquire the requisite knowledge of a subject matter through experience and observation in a variety of ways, including participation in a vocation, without formal training or education." Kilby, 52 Va. App. at 410 (quoting Conley, 273 Va. at 560). This Court will not reverse a trial court's decision to

admit testimony of an expert "unless it plainly appears that the witness was not qualified." Id. (quoting Conley, 273 Va. at 560).

The Commonwealth presented Special Agent Witt's qualifications when introducing her as an expert witness. She testified that she was a special agent assigned to the Bureau of Criminal Investigation with the Virginia State Police. Witt attended the Virginia Forensic Science Academy, where she received some general training in analyzing blood spatter. After graduation, she received more than forty additional hours of training to become blood spatter certified. Witt also attended three more blood spatter training courses, including an advanced course where photographs were used. At one of those courses, she helped train new examiners, and she was an assistant instructor at another. Her training included an advanced "blood fabric course." Over the duration of her career, Witt had consulted more than 200 times on blood spatter evidence. She had qualified as a blood spatter expert in court on three prior occasions and had never been rejected as an expert. As for her formal education, Witt obtained a Bachelor of Science in Health Education and a Master of Science.

Blood spatter analysis "involves the application of principles of physics, chemistry, biology, and mathematics." Smith v. Commonwealth, 265 Va. 250, 252 (2003). "Depending on the type of stain and the circumstances, a number of different conclusions can be reached, such as the cause of the stain, its point of origin, and the direction in which the blood droplets were going at impact." Id. The analysis is "clearly a well recognized discipline, based upon the laws of physics, which undoubtedly assist[s] the jurors in understanding what occurred." Id. (alteration in original) (quoting State v. Rodgers, 812 P.2d 1208, 1212 (Idaho 1991)).

The record makes clear that Special Agent Witt possessed "a degree of knowledge of [the] subject matter" of blood spatter evidence "beyond that of persons of common intelligence and ordinary experience." See Justiss v. Commonwealth, 61 Va. App. 261, 271 (2012) (quoting

Conley, 273 Va. at 560). She gained this knowledge through specialized training and vocational experience. Cf. Stevens v. Commonwealth, 72 Va. App. 546, 556 (2020) (affirming the admission of expert testimony on the subjects of child abuse and disclosure). Consequently, the trial court acted within its discretion in ruling that Witt was qualified to testify as an expert in blood spatter evidence.

Despite Virginia standards, the appellant argues based on the SFSUS guidelines for the qualification of experts that Witt was not in fact qualified to testify as an expert in blood spatter. The SFSUS report provides that appropriate blood spatter analysis at a minimum requires certain knowledge, such as "an understanding of the physics of fluid transfer" and "pathology of wounds." SFSUS, supra, at 177. It also emphasizes the importance of formal education in addition to experience, specifying that such an expert should have "an appropriate scientific education." Id. at 177-78.

During *voir dire*, the appellant asked Witt about each of the qualifications recommended by the report. See id. at 177. She averred that she met those qualifications. Witt agreed that an analyst should have an "appropriate scientific education" and cited her health education degree as her scientific education, stating that she took advanced biology courses. Witt also explained that her conclusions in this case were not difficult and suggested that they could not be wrong.

The trial court had Witt's testimony about her qualifications before it and was aware of the appellant's position that Witt did not meet all of the qualifications set forth in the SFSUS for blood spatter analysts. However, the record does not compel the appellant's suggested conclusion that Witt was not qualified under the SFSUS guidelines to render a conclusion based on her blood spatter analysis. To the contrary, she testified that she met the qualifications listed in the report. To the extent that the appellant disagrees with Witt's assessment of whether her educational background constitutes an "appropriate scientific education," that was a factor for

the trial court's consideration in determining whether Witt was qualified as an expert under the Virginia Rules of Evidence. See Va. R. Evid. 2:702(a)(i)-(ii).

At trial, the appellant cited the SFSUS report to support the proposition that Witt did not have knowledge beyond that of a common layperson because she did not have the requisite formal qualifications. However, the SFSUS merely sets forth guidelines and does not purport to provide qualifications necessary for a witness to testify as an expert in a trial in any jurisdiction. SFSUS, supra, at xix-xx. More importantly, in Virginia, to qualify as an expert, a witness can gain specialized knowledge "beyond that of persons of common intelligence and ordinary experience . . . through experience and observation in a variety of ways, including participation in a vocation, without formal training or education." Kilby, 52 Va. App. at 410 (quoting Conley, 273 Va. at 560).

The report cited by the appellant was before the trial court during its consideration of Witt's qualifications to testify as an expert. Her qualifications included academic degrees in science. Virginia law allows an expert to gain expertise solely through vocational training, which Witt also clearly had. For these reasons, the trial court did not err in determining that Witt was qualified to testify as a blood spatter expert.

### B. Scope of Expertise to Provide an Opinion Based on Photographs

The appellant contends that Special Agent Witt's testimony exceeded her expertise because she reviewed photographs and did not go to the crime scene even though she acknowledged that it was "always helpful . . . to go to the scene." The appellant cites CNH America v. Smith, 281 Va. 60, 68 (2011), for the proposition that the trial court erroneously allowed Witt to testify on matters beyond her area of expertise because she was not qualified to draw conclusions based on photographs. This challenge to the evidence encompasses all of Witt's expert opinion testimony.

"An expert's qualifications must correlate to the opinions for which the expert [testimony] is being offered." CNH, 281 Va. at 68. In that vein, "[t]he fact that a person is a qualified expert in one field does not make him an expert in another field, even if they are closely related." Id. That is not what happened here.

Witt explained that of the more-than-200 times she had consulted on blood spatter evidence, on 95% of those occasions she looked only at photographs. She explained that she had eighty hours of "photography experience and training." Special Agent Witt had received training from the Department of Forensic Science specifically on photography and interpreting whether photographs had been distorted in any way. Again, the record supports the conclusion that Witt possessed "a degree of knowledge of [the] subject matter" of basing blood spatter opinion on photographs "beyond that of persons of common intelligence and ordinary experience." See Wakeman, 69 Va. App. at 536 (alteration in original) (quoting Justiss, 61 Va. App. at 271). Witt's opinion testimony was limited to the conclusions that the blood on the appellant's shoe had dropped from a nearly ninety-degree angle, that the mattress had a saturation blood stain, and that the blood stains in the car were "transfer stains." The fact that she reached these conclusions after reviewing photographs and did not go to the crime scene at most goes to the weight of her testimony rather than its admissibility. See generally Church v. Commonwealth, 71 Va. App. 107, 122-23 (2019) (holding that "[o]nce [the] threshold for proving admissibility has been met, any gaps in the evidence are relevant to the trier of fact's assessment of its weight rather than its admissibility"). Accordingly, the trial court acted within its discretion by admitting Witt's expert opinion testimony.

## C. Foundation Based on Hearsay

The appellant suggests the trial court erred by admitting Witt's testimony regarding the shoe because she based her opinion on hearsay not in evidence. He specifically addresses only

her conclusion that the blood dripped onto his shoe from a ninety-degree angle, describing it as the "crucial portion" of her testimony. The Commonwealth argues that this assignment of error is procedurally barred because the appellant failed to obtain a ruling from the trial court on this argument.

### 1. Rule 5A:18

It is the appellant's burden "to obtain a clear ruling from the trial court" on an issue he wishes to raise on appeal. See Young v. Commonwealth, 70 Va. App. 646, 657 (2019). This burden stems from the requirement that a litigant state an objection "with reasonable certainty at the time of the ruling." See Rule 5A:18. The primary reason for "requiring timely specific objections is to afford the trial court an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals." Williams v. Commonwealth, 57 Va. App. 341, 347 (2010); see Bethea v. Commonwealth, 297 Va. 730, 743 (2019) ("Specificity and timeliness undergird the contemporaneous-objection rule . . . .").

At trial, the appellant argued that Witt's forensic background did not qualify her to testify as an expert in the specialized field of blood spatter. He also contended that the opinion was impermissibly based in part on her out-of-court conversations about the photographs. The court overruled the objection, specifically addressing the first prong of the objection by expressly concluding that Witt was qualified to testify as an expert. It did not give any reasons regarding the second prong of the objection, commenting only that "there's a foundationary aspect to this too."

The trial court clearly overruled the appellant's objection and allowed Witt to testify, even though it did not give its reasons for rejecting his foundation argument. See Findlay v. Commonwealth, 287 Va. 111, 116 (2014) (noting that trial judges do not always give reasons for their rulings). We conclude that the issue is adequately preserved for appellate review.

## 2. Merits

The appellant argues that the trial court erred by admitting Witt's testimony because she based her opinion in part on a conversation not in evidence, specifically that the "photographs she relied upon had been taken before the evidence was altered." He reasons that therefore Witt's blood spatter opinion lacked a proper foundation.

"Determining whether an adequate foundation has been laid for the admission of an expert opinion is an exercise of the trial court's discretion, to be made in light of all the testimony produced." Smith, 265 Va. at 254. Testimony "lack[s] a proper foundation" if an expert has based her opinion on facts not in evidence. Sanders v. Commonwealth, 282 Va. 154, 159 n.1 (2011). "Generally, an expert witness in Virginia has not been permitted to base [her] opinion on facts not in evidence." Simpson v. Commonwealth, 227 Va. 557, 565 (1984). Instead, "an 'expert may give an opinion based upon [her] own knowledge of facts disclosed in [her] testimony or [she] may give an opinion based upon facts in evidence assumed in a hypothetical question.'" Id. (quoting Walrod v. Matthews, 210 Va. 382, 388 (1969)).

Special Agent Witt testified that she referenced several materials when conducting her analysis, including photographs, certificates of analysis, and the autopsy report.[4] However, when Witt explained her conclusion to the jury, she specifically relied on a single photograph. That photograph, a close-up shot of the blood stain on one of the appellant's tennis shoes, had been admitted into evidence without objection. Witt explained that she consulted with the Commonwealth's attorney "to discuss any changes that may have occurred" to the photographed items. Witt described the stain on the shoe as round and stated that such a stain results from the blood falling onto the surface at approximately a ninety-degree angle.

---

[4] Witt testified that she "was told" that the shoes had been altered by the Department of Forensic Sciences for purposes of DNA testing. As a result, she drew her conclusions based on the photographs of the shoes taken contemporaneously by a crime scene technician.

The appellant does not challenge the principle that an expert is permitted to testify to an opinion derived from exhibits in evidence. See generally Simpson, 227 Va. at 566. Instead, he suggests that the particular photograph here was not a sufficient basis from which to form an expert opinion because Witt relied on her out-of-court conversation with the Commonwealth's attorney in evaluating the photograph and the photographer did not testify as to when or where he took it. Special Agent Witt's conversation with the Commonwealth's attorney does not affect the admissibility of her opinion because, in testifying, she did not base her opinion on that conversation but instead on the photograph that was in evidence. The questions about the accuracy of the photograph that the appellant raises were proper considerations at the time that it was introduced into evidence, not at the time the expert was testifying using the photo.[5] See Va. R. Evid. 2:901 ("The requirement of authentication or identification is a condition precedent to admissibility that is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims."). "Once the threshold for proving admissibility" was met, these questions concerning the photograph's accuracy were relevant only to the jury's assessment of the weight to give it. See Church, 71 Va. App. at 122; see also Reedy v. Commonwealth, 9 Va. App. 386, 391 (1990) ("Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence.").

---

[5] Detective John Flores with the City of Richmond Police Department authenticated the shoe photograph that Witt relied on in her testimony. He explained that he took the photograph of the shoe. Detective Steven Jones, also of the Richmond Police Department, testified that he found the pair of shoes in the appellant's bedroom. Jones identified the shoes as looking substantially the same in the courtroom as they did when he found them except for an identification tag. Kenna Heise, a forensic scientist at the Virginia Department of Forensic Science, analyzed the blood found on one of the shoes. Heise stated that the photograph in question depicted a close-up of the stain she tested.

In addition, the appellant speculates that possible alterations to the shoe after the blood got on it but before the photograph was taken could have misinformed Witt's conclusion that the blood dripped onto the shoe from a ninety-degree angle. Again, once the photograph was admitted into evidence, any alleged deficiencies in the evidence were relevant to the jury's assessment of how much weight to assign it. See Smith, 265 Va. at 255; Church, 71 Va. App. at 122.

The appellant had the opportunity to raise the same questions that he does now regarding the condition of the shoe as depicted in the photograph that Witt relied on in her testimony. However, he did not make those arguments to the jury. With the photograph on which Witt based her opinion in evidence, the jury had the opportunity to evaluate that photograph and, by extension, the basis of Witt's opinion. Witt based her opinion testimony regarding the drip on the shoe only on the photograph in evidence. In contrast, her out-of-court conversation with the Commonwealth's attorney served as mere background information. Consequently, the trial court acted within its discretion by concluding that the Commonwealth laid an adequate foundation for Witt's expert opinion regarding the blood on the shoe.

For these reasons, the appellant's assignments of error fail on the merits.

### III. CONCLUSION

On this record, the trial court acted within its discretion in ruling that Witt was qualified to testify as an expert in blood spatter evidence and give her opinion based on a photograph in

evidence.[6]  Consequently, the trial court did not abuse its discretion by admitting Witt's expert

testimony on blood spatter, and we affirm the convictions.

Affirmed.

---

[6] Because we affirm the convictions based on the merits of the assignments of error, we do not consider the Commonwealth's additional argument that any errors in allowing the expert testimony were harmless.  See, e.g., Riddick v. Commonwealth, 72 Va. App. 132, 146 n.7 (2020) ("[J]udicial restraint dictates that [appellate courts] decide cases on the best and narrowest grounds available." (quoting Commonwealth v. White, 293 Va. 411, 419 (2017))).  "In this case, resolution of the merits constitutes the best and narrowest ground" for addressing the issues. Abdo v. Commonwealth, 64 Va. App. 468, 473 n.1 (2015) (declining to consider the Commonwealth's 5A:18 argument and instead addressing the merits); see Sanders v. Commonwealth, 64 Va. App. 734, 742 n.3 (2015) (noting that the best and narrowest ground on which to affirm the case was the merits rather than harmless error review).