COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Raphael and Lorish

LATRICE CURTIS

MEMORANDUM OPINION* BY
JUDGE GLEN A. HUFF
SEPTEMBER 27, 2022

v.      Record No. 0080-22-4

STAFFORD COUNTY DEPARTMENT
  OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A.B. Willis, Judge

(Nathanael W. Buczek; Buczek Carpenter, PC, on brief), for
appellant. Appellant submitting on brief.

(Kristie L. Kane; Brittany S. Carper, Guardian *ad litem* for the minor
children; Kane Perry, P.L.C.; Goodall, Carper & Dillon Law, PLLC,
on brief), for appellee. Appellee and Guardian *ad litem* submitting
on brief.

Latrice Curtis ("mother") appeals the circuit court's orders terminating her parental rights to

her children and approving the foster care goal of adoption. Mother argues that the circuit court

erred in terminating her parental rights under Code § 16.1-283(C)(2) and approving the foster care

goal of adoption. She first argues termination was not in the children's best interests. Next, she

claims the circuit court erred in applying Code § 16.1-283(C)(2)'s twelve-month standard—the

period during which a parent must substantially remedy the conditions precipitating the removal of

her child—because the COVID-19 pandemic and the Virginia Supreme Court's accompanying

emergency orders created an insurmountable delay. Mother also alleges that the circuit court erred

by admitting medical and psychological records, which she says contained inadmissible hearsay

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

from the children.  Finally, mother contends that the circuit court erred in accepting Monika

Kral-Dunning, a nurse, as an expert witness on child abuse.  This Court finds no error and affirms

the decision of the circuit court.

## I.  BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the

evidence in the light most favorable to the party prevailing in the circuit court."  *Yafi v. Stafford*

*Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of*

*Hum. Servs.*, 63 Va. App. 157, 168 (2014)).

Mother and Eugene Ellis ("father") are the biological parents to E.C-E., Sy.C-E., Z.C-E.,

Si.C-E., and R.C-E.  The children first came to the attention of the Stafford County Department of

Social Services (the "Department") on September 20, 2019, following a complaint of physical

neglect when R.C-E. was admitted to the hospital with a temperature of 103.2 degrees.  R.C-E. had

received no medical care in the nine months following birth, had received only one vaccination, and

had scabbed-over rashes on the chest, arms, and legs.  R.C-E. also had an ear infection "for quite

some time," coupled with drainage from both ears.  R.C-E. was transferred to Children's National

Hospital and diagnosed with "eczema herpeticum, atopic dermatitis with the herpes simplex virus."

On September 23, 2019, the Department received a report regarding domestic violence

between mother and father.  After investigating, the Department also learned that the children went

hungry at times and were "beat[en] and sometimes punched."  Sy.C-E., who was five years old at

the time of removal, had not begun school due to lack of the required physical and immunizations.

---

[1] The record in this case is sealed.  Nevertheless, this appeal necessitates unsealing
limited portions of the record, including factual findings, to resolve the issues appellant has
raised.  Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record,
[this Court] unseal[s] only those specific facts, finding them relevant to the decision in this case.
The remainder of the previously sealed record remains sealed."  *Levick v. MacDougall*, 294 Va.
283, 288 n.1 (2017).

E.C-E. informed school officials that the children went hungry when mother "forgets to go to the store." The Department noted scratches and bruises on the children and that the children appeared to be "unclean."

On October 11, 2019, police responded to mother's residence after she reported that father had acted violently toward her, but police could not determine whether an assault had occurred. Mother called 911 later that same day and asked for the Department's assistance. She said "she would not keep her kids and 'they could not make her'" and asserted that the children needed to go either to father or to the Department. Although officials advised mother to call 911 only for emergencies and that leaving her children could result in a felony child neglect charge, she continued to call during the following days. The police ultimately arrested father for violating a protective order and mother for misusing 911.

On October 18, 2019, the Department received a report of abuse of Sy.C-E. after father showed the director of Sy.C-E.'s daycare bruises on Sy.C-E.'s leg and hip. The Department met with Sy.C-E. on October 22, 2019, and noted an injury that appeared consistent with a strike from a phone cord. Sy.C-E. told the Department that Sy.C-E.'s maternal aunt caused the injuries. Dr. Robin Foster, a pediatrician and the director of the Child Protection Team at the Children's Hospital in Richmond, testified that Sy.C-E.'s injuries were "not consistent with having happened in normal play or for an accidental causation or being self-inflicted by the child."

School officials also informed the Department that they washed E.C-E. and Sy.C-E.'s clothes because they were "unclean." The Department received a video of E.C-E. and Sy.C-E. in which they informed school officials that father and their maternal aunt "beat them with a belt and their hands."

The Department took emergency custody of all five children on October 23, 2019. At the time of removal, mother was incarcerated, and the children lived with their maternal grandmother

and maternal aunt. Following removal, the Department requested that mother provide proof of housing, employment and income, and a reliable means of transportation. The Department also required mother to participate in family partnership meetings and family team meetings, attend parenting classes, undergo a psychological evaluation and follow the accompanying recommendations, and participate in supervised visitation with the children.

The Department received a subsequent complaint in February 2020 against mother, which alleged that she would cut Z.C-E. when the child "was bad" while in her care. As a result, mother was arrested for contributing to the delinquency of a minor, child abuse, disregard for life, and two counts of obstruction of justice. On March 26, 2020, the Department made a founded disposition, Level 1, for physical abuse by mother against Z.C-E.[2]

Dr. Andrew Anderson, a clinical psychologist, performed a psychological evaluation on mother. Mother reported to Dr. Anderson a history of postpartum depression and panic attacks; she also told him that she took several medications, including anxiety medication and a mood-stabilizer/anticonvulsive. Dr. Anderson conducted a Child Abuse Potential Inventory on mother, from which Dr. Anderson opined that mother was unable to protect the children from abuse. Dr. Anderson explained that mother had "marginal cognitive abilities," had difficulty "identifying and handling problems," and engaged in "impulsive behavior." Dr. Anderson found that mother had trouble with "self-protect[ion]," which indicated that she would have difficulty protecting the children. Dr. Anderson concluded that mother had "general anxiety disorder and a number or personality maladaptive personality traits that fall under the rubric of dependent history and emotional personality traits." He believed mother needed "a course of mental health treatment of a one-year duration or possibly longer." He also determined that her capacity to parent the children was "seriously limited" due to her "marginal cognitive abilities, her significant problems with

---

[2] At the time of the circuit court hearing, mother's criminal matters were still pending.

depression and anxiety or panic attacks, [and] her . . . defensiveness or lack of insight," which he explained was "predictive of failure to respond to treatment." Dr. Anderson concluded mother's "low tolerance for stress and frustration" would make it difficult for her to manage the demands of parenting.

Mother began counseling in January 2020; her therapist subsequently diagnosed her with anxiety with depression and passive-dependent personality disorder. In December 2020, mother's therapist noted that mother did "not actively participate in treatment" or "complete suggested activities between sessions," and was "guarded when discussing treatment goals." The therapist further noted that mother's response to treatment was "poor" because of her lack of participation in the treatment. Mother's therapist ultimately discharged her from treatment for non-compliance. According to the therapist, mother showed a "[l]ack of progress . . . due to [a] lack of active participation in treatment" and had missed a scheduled appointment after already failing to participate in treatment for over thirty days. As of the date of the circuit court hearing, mother had not resumed counseling. Although mother had medication for her mental health, she admittedly did not take them as prescribed.

Mother testified that she had previously worked in an assisted living home but was no longer employed in that capacity. She further testified that she began working full-time at a temporary agency approximately a month before the circuit court hearing. She acknowledged that she did not provide the Department with proof of her current employment.

Mother had lived in her mother's residence but left because the children's aunt, who allegedly abused some of the children, also lived at the residence. Mother testified that as of the date of the circuit court hearing, she had been approved for public housing but did not have the "actual voucher." In the meantime, she stayed at "a couple of different friends' house[s]." For transportation, she relied on public transportation and ride sharing services.

The Department placed the children in separate homes following removal. E.C-E., who was eight years old at the time of the circuit court hearing, was in her fifth placement at the time of the circuit court hearing. She had "tantrums" that included "throwing items, hitting, kicking, [and] spitting." Following the placement, she initially received "active, intensive, in home" counseling for multiple hours every week and continued to participate in outpatient counseling biweekly.

Sy.C-E., who was seven years old at the time of the circuit court hearing, stayed in the same foster home until early 2020. Later, however, the Department transferred Sy.C-E. to a residential treatment facility due to suicidal ideations. Sy.C-E. had been hospitalized three times since coming into foster care for "[s]uicidal ideation, aggression, anger, and erratic behavior." While in foster care, Sy.C-E. met regularly with an individual counselor and participated in group therapy, animal therapy, art therapy, and music therapy.

Z.C-E., who was six years old at the time of the circuit court hearing, lived in a therapeutic foster care home and received out-patient counseling for post-traumatic stress disorder. A forensic medical exam conducted after removal revealed that Z.C-E. had several healing wounds and injuries that were "consistent with non-accidental inflicted trauma." When initially entering foster care, Z.C-E. acted frightened and nervous around others. Over time, Z.C-E. bonded strongly with his foster family, regularly attended school, and showed much progress. Z.C-E.'s counselor warned that there would be "risks" to Z.C-E.'s emotional and mental well-being should Z.C-E. return to his biological family.

Si.C-E., who was five years old at the time of the circuit court hearing, had been in the same foster home since removal. Si.C-E. regularly participated in counseling for post-traumatic stress disorder because she had been picking out her hair, picking her cuticles, withholding bowel movements, and experiencing sleeplessness and bed-wetting. Si.C-E. attended daycare full time, and teachers complimented her behavior.

R.C-E., who was three years old at the time of the circuit court hearing, had lived in the same foster home since removal and thrived there. The Department described R.C-E. as "joyful" and "developmentally on track."

Since coming into care, the four older children received restorative dental care to repair "multiple cavities." The children also received necessary pediatric care. E.C-E. saw a urologist due to bed-wetting issues. Si.C-E. suffered from a sleep disorder, allergies, and skin irritation. Si.C-E. also received treatment from a gastroenterologist and a urologist for problems with bowel movements and urination accidents, respectively. R.C-E. received treatment from a pulmonologist, an orthopedist, and an ear, nose, and throat doctor. R.C-E. underwent two different procedures: a "scope of multiple areas" and a corrective procedure to repair a "cleft in [the child's] throat" that created difficulty swallowing.

In September 2020, the Department requested that the Stafford County Juvenile and Domestic Relations District Court (the "JDR court") terminate mother's parental rights and approve the new foster care goal of adoption.[3] The JDR court denied the request on November 2, 2020, and gave both parents more time to complete the Department's requirements. In December 2020, the Department again requested a change of goal to adoption. Following a trial in April 2021, the JDR court approved the change to adoption and terminated mother's parental rights on April 21, 2021. Mother appealed the JDR court's order to the circuit court.

The circuit court held a *de novo* trial on November 17 and 18, 2021. During the trial, the Department offered Monika Kral-Dunning, a registered nurse, as an expert witness on child abuse. Mother challenged Kral-Dunning's qualifications as an expert. The Department presented evidence that Kral-Dunning had experience with forty-five pediatric physical abuse cases and had previously testified as an expert in the areas of physical abuse, sexual abuse, and

_____

[3] The Department also sought the termination of father's parental rights.

child physical abuse. Kral-Dunning also had training in adult, adolescent, and pediatric sexual assault nurse examining. After considering her curriculum vitae and experience, the circuit court accepted Kral-Dunning as an expert witness in the area of child abuse. Kral-Dunning testified that she had examined Z.C-E.'s injuries and, to a reasonable degree of medical certainty, determined that the injuries were consistent not with regular child's play or self-injury, but instead with non-accidental inflicted trauma.

The Department sought to admit Kral-Dunning's report, which included Z.C-E.'s statements that "old mom hit me with a belt" and "old mom's fingernails" caused injury to Z.C-E.'s upper arm.[4] The Department also sought to admit a report by Dr. Foster, who examined Z.C-E. Dr. Foster's report included Z.C-E.'s statements that mother "beat me and . . . hit me . . . [and] cut me with a knife." Dr. Foster testified that Z.C-E. had injuries and scars consistent with the statements.

Mother objected to the admission of both reports on the basis that the child's statements were inadmissible hearsay, but the circuit court overruled the objections and admitted the reports.

After hearing the evidence and arguments, the circuit court approved the foster care goal of adoption and found that it was in the children's best interests to terminate mother's parental rights under Code § 16.1-283(C)(2). The circuit court entered a letter opinion, which first explained that the termination of rights was appropriate because mother had not remedied the conditions that led to the children's placement and continuation in foster care. In fact, the circuit court found that mother was "in a less than optimal position" to care for her children. The circuit court found that mother "did not convey any concern or understanding as to the seriousness of

---

[4] After removal, Z.C-E. referred to mother as "old mom" and used the term "new mom" to refer to his foster mother.

her children's mental health conditions or physical complications as the result of her parenting." The court further found that mother could not provide adequate housing for the children and also expressed concern about mother's unverified employment and that she had not set up daycare or schooling for the children. Although the Department had offered mother "substantial" assistance, the circuit court explained that mother failed to accept any responsibility for the conditions that led to the children's removal.

The circuit court next found that termination of mother's parental rights was in the children's best interests. The circuit court determined that mother failed to plan for E.C-E.'s future, which the court found was necessary to address E.C-E.'s mental and physical needs. The circuit court found Sy.C-E.'s condition "most troubling" based on "suicidal and aggressive" behavior and determined that mother did not understand or appreciate Sy.C-E.'s condition and failed to accept any responsibility for it. Mother also displayed "minimal effort to engage in [Sy.C-E.'s] treatment." The circuit court then cited the benefits of foster placements for the children and the risks they would face if returned to their mother. Z.C-E. had "the most to lose if . . . reunited with . . . mother" based on Z.C-E.'s bond with the foster family and Z.C-E.'s "fear" of mother and father. Si.C-E. was "thriving" in foster care but had demonstrated "behavioral issues" following any visitations with mother and father. R.C-E.'s foster care placement had "been most positive" because the child received "desperately needed" medical care. And mother did not "appear to understand the dire nature of [R.C-E.'s] medical condition" or "appreciate the severity of the neglect" R.C-E. suffered under her care. The circuit court concluded that termination of mother's parental rights served the best interest of each of the five children because she was "unable to appreciate the severity of the abuse they suffered while in her care."

On December 21, 2021, the circuit court entered orders terminating mother's residual parental rights as to all five children and approved the foster care goal of adoption. This appeal followed.[5]

## II. ANALYSIS

### A. <u>Termination of Mother's Parental Rights and Foster Care Goal of Adoption</u>

Mother argues that the circuit court erred in terminating her parental rights and approving the foster care goal of adoption. "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Mother contends that the circuit court erred in terminating her parental rights because the Department offered no evidence that she lacked the ability to care for the children's medical and psychological needs. She insists she could care for the children and take them to their necessary appointments, pointing to her evidence that she has transportation, conditional housing, and consistent employment. Mother acknowledged that she did not have definite housing or childcare in place at the time of the circuit court hearing because she did not have custody of the children and "she would be able to plan once she had them back."

---

[5] The circuit court also terminated father's parental rights and he, too, appealed the circuit court's ruling to this Court. *See Ellis v. Stafford Cnty. Dep't of Soc. Servs.*, No. 0216-22-4.

The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2), which allows for termination where

> the parent . . . , without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

The record provides ample evidence to support the circuit court's findings that (1) terminating mother's parental rights was in the children's best interests and (2) that mother did not "remedy substantially the conditions" leading to the children's placement in foster care. Code § 16.1-283(C)(2). The children suffered physical abuse and neglect while under mother's care—with many of them having injuries and scars to show for it. On top of that, at every turn, mother failed to show concern for, or understanding of, the seriousness of her children's mental health conditions or physical complications. Indeed, the children's need for extensive and varied mental health, dental, and medical treatment upon entering care demonstrate mother's inability to meet—or even appreciate—their needs.

Moreover, mother did not rectify the circumstances that led to the children's placement in foster care. She never offered evidence of verified employment, did not complete required counseling, failed to acknowledge her issues that led to the children's removal, never enrolled the children in daycare or school, and admitted she did not take her prescribed medication.

As for the children, most benefited significantly from their foster care placements. Each of the children has unique medical and psychological needs, and they have received the care they need—including individualized counseling, medical care, and dental care—in their foster placements. Additionally, at the time of the circuit court hearing, the children had already been in foster care for more than two years—long past the twelve months the statute gives parents to rectify the circumstances that precipitated their children's removal. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)).

For all of these reasons, the circuit court did not err in finding that it was in the best interests of the children to terminate mother's parental rights under Code § 16.1-283(C)(2).[6]

## B. Code § 16.1-283(C)(2) Time Period

Mother also asserts that the circuit court erred in applying Code § 16.1-283(C)(2)'s twelve-month standard because the COVID-19 pandemic (and the Virginia Supreme Court's accompanying emergency orders[7]) delayed resolution of her pending criminal case—which in turn delayed her completion of the Department-imposed requirements. Mother explains that "it seems that almost three years is too short an interval to expect resolution in her current case," and asks that this Court focus on her completed requirements, rather than those that remain outstanding.

---

[6] With respect to mother's challenge of the foster care goal of adoption, this Court's "decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." *Toms*, 46 Va. App. at 265 n.3.

[7] The Supreme Court's emergency orders tolled the statutory speedy trial deadline. *See Ali v. Commonwealth*, 75 Va. App. 16, 52 (2022); *see also* Order Declaring a Judicial Emergency in Response to COVID-19 Emergency 1-2 (Va. Mar. 16, 2020).

As described above, Code § 16.1-283(C)(2) provides a basis for termination where a parent has failed to remedy substantially the conditions requiring removal "within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care." That "twelve-month time limit 'was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.'" *Thach*, 63 Va. App. at 171 (quoting *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 56 (2003)). "The phrase, 'within a reasonable time' is not definable by any prescribed rule. Its meaning depends upon the context and the attendant circumstances; not upon mere opinion or expectation." *Kaywood*, 10 Va. App. at 540 (citing *Va. Ass'n of Ins. Agents v. Commonwealth*, 187 Va. 574, 579 (1948)).

At the time of the circuit court hearing, the children had languished in foster care for over two years, giving mother more than twelve months to complete the Department's requirements. Although mother argued in the circuit court that her criminal matter was not resolved due to the COVID-19 pandemic, the record does not show that mother informed the Department that the pandemic or her pending criminal case delayed her in obtaining housing, verifying employment, or completing counseling. At the hearing, the circuit court noted that mother already received extra time to complete the Department-imposed requirements. Nothing in the record indicates that additional time would have improved mother's situation or changed when she would be ready to take custody of the children. Therefore, the circuit court did not err in concluding that mother failed to remedy the conditions that led to the children's removal in a reasonable time period.

## C. Hearsay Objection

Mother next asserts that the circuit court's admission of the medical records that contained the children's statements was more prejudicial than probative and were inadmissible hearsay. "[T]he admissibility of evidence 'is within the broad discretion of the trial court, and an

- 13 -

[evidentiary] ruling will not be disturbed on appeal in the absence of an abuse of discretion.'" *Castillo*, 68 Va. App. at 558 (second alteration in original) (quoting *Surles v. Mayer*, 48 Va. App. 146, 177 (2006)).

"[H]earsay evidence is 'testimony in court . . . of a statement made out of court, [that is] offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.'" *Campos v. Commonwealth*, 67 Va. App. 690, 704 (2017) (second alteration in original) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). "[H]earsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule, and . . . the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions." *Id.* at 705 (alterations in original) (quoting *Godoy v. Commonwealth*, 62 Va. App. 113, 119 (2013)).

One such exception, which applies "even though the declarant is available as a witness," allows for the admissibility of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Va. R. Evid. 2:803(4). Those statements, however, must be reliable to be admitted, as "reliability is the touchstone for determining admissibility of a patient's out-of-court statements that are made for diagnosis and treatment purposes." *Campos*, 67 Va. App. at 711.

On appeal, mother specifically challenges the reliability of Z.C-E.'s statements contained in Kral-Dunning and Dr. Foster's respective reports.[8] During the circuit court trial, Kral-Dunning testified that Z.C-E. consistently described the cause of the injuries throughout the interview and examination and that Kral-Dunning found those statements reliable. Moreover, Dr. Foster testified

---

[8] Although mother mentions other admitted medical records for Sy.C-E., E.C-E., and Si.C-E., she does not challenge the reliability of the other children's statements to medical providers. Accordingly, this Court will not address the admissibility of those records.

- 14 -

that Z.C-E.'s statements were "spontaneous and cohesive and coherent," and did not raise concerns that the child did not understand the statements or changed the statements over time. Dr. Foster further testified that the treatment team found Z.C-E. credible. Given this evidence to support the credibility of the statements, the circuit court did not abuse its discretion in finding the statements reliable and admitting the reports.

### D. Expert Witness

Finally, mother argues that the circuit court erred in accepting Kral-Dunning as an expert witness because, although she was well experienced in sexual assault cases, she did not have particularized experience or training in abuse and neglect. "'Whether a witness is qualified to testify as an expert is a matter within the sound discretion of the trial court,'" and this Court "applies an 'abuse of discretion standard when reviewing a trial court's decision to admit expert opinion testimony.'" *Online Res. Corp. v. Lawlor*, 285 Va. 40, 59 (2013) (first quoting *Lockheed Info. Mgmt. Sys. Co. v. Maximus, Inc.*, 259 Va. 92, 111 (2000); and then quoting *CNH Am. LLC v. Smith*, 281 Va. 60, 66 (2011)). "Only when reasonable jurists could not differ can [the Court] say an abuse of discretion has occurred." *Schmuhl v. Commonwealth*, 69 Va. App. 281, 299 (2018) (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)). Therefore, "[a] trial court's decision that a witness is qualified as an expert 'will not be disturbed on appeal unless the record clearly shows that the witness was not qualified.'" *Wakeman v. Commonwealth*, 69 Va. App. 528, 535 (2018) (quoting *Spencer v. Commonwealth*, 238 Va. 563, 573-74 (1989)), *aff'd*, 298 Va. 412 (2020).

Contrary to mother's argument, the circuit court considered Kral-Dunning's experience in pediatric physical abuse cases. Kral-Dunning previously testified as an expert on physical abuse, sexual abuse, and child physical abuse in other pediatric physical abuse cases. Moreover, the circuit court found that Kral-Dunning had received sufficient training in issues related to child abuse.

Thus, the circuit court did not abuse its discretion in accepting Kral-Dunning as an expert witness on child abuse.

## III. CONCLUSION

For the foregoing reasons, this Court affirms the circuit court's ruling.

*Affirmed.*